## THE MEXICAN PRINCE.

### STEINWENDER et al. v. THE MEXICAN PRINCE.

(District Court, S. D. New York. August 25, 1897.)

1. DAMAGE TO CARGO—ABSENCE OF SOUNDING PIPES—EQUIVALENT PROVISIONS —SEAWORTHINESS.

In a convertible steamer, built to carry fluids in bulk, as well as dry and perishable cargoes, a pipe line ran forward from the pump room, in the stern of the vessel, into and through the separated cargo compartments, with an offset from the main line in each, which could be opened and closed by a Kingston valve, operated by a spindle from the deck. Provision was made for testing these valves, and for ascertaining the presence of water in any compartment, and for removing it promptly, by means of the pumps and pipe line. No deck sounding pipes were fitted. Damage having occurred by water entering a compartment from the pipe line, held, that the provisions made were adequate to prevent damage to dry cargo from water ballast in an adjoining tank, if properly managed, and that the vessel was not unseaworthy by reason of the absence of sounding pipes.

2. SAME—HARTER ACT—FAULT IN MANAGEMENT.

The steamer sailed with her No. 2 tank full of water for ballast, and with the neighboring compartments full of coffee in bags. During the voyage this water ballast was removed through the main pipe line, but, owing to the failure to have the valve in the offset leading into No. 3 tank closed, water entered there, damaging the coffee. Those in charge omitted to test the valve by means of the pumps, or to count the turns of the spindle which opened and closed the valve, before using the pipe line to discharge the ballast. These tests would have shown that the valve was not shut. Held, that the damage arose from neglect in the "management of the ship," within the third section of the Harter act, and that the steamer was not liable therefor. The Silvia, 64 Fed. 607, Id., 15 C. C. A. 362, 68 Fed. 230, and The Sandfield, 79 Fed. 371, followed and applied.

3. SAME—ALLEGED OBSTRUCTION OF VALVE ON SAILING—SEAWORTHINESS.

On the evidence, held, that it did not appear, as contended, that the valve was obstructed by pieces of wood at the outset of the voyage. Held, further, that such alleged obstruction, if it existed, would not have amounted to unseaworthiness, because accidental and temporary in character, and certain to be removed by application of the pumping tests prescribed by the shipowners' written instructions.

4. SAME—STOWAGE—PROXIMATE CAUSE OF DAMAGE—SEAWORTHINESS—FAULT IN MANAGEMENT.

Held, that the vessel was not unseaworthy in respect of her cargo by reason of the stowage of coffee in a compartment adjoining that in which water ballast was carried; that the pipe line, valve, and pumping arrangements were adequate to have prevented the damage, if properly managed; and that, therefore, the loss must be attributed to improper "management," and not to unseaworthiness.

Lawrence Kneeland, for Steinwender and others.

Edmund L. Baylies and Walter F. Taylor, for Elmenhorst and others.

Harrington Putnam, for Crossman and others.

Convers & Kirlin and J. Parker Kirlin, for the Mexican Prince.

BROWN, District Judge. The above three libels (consolidated) were filed to recover $36,500 damages to 963 bags of coffee, part of the cargo of the steamship Mexican Prince, shipped at the way port of Rio Janeiro, upon a voyage from Buenos Ayres to New York, in

May, 1895.    The damage was done by water, which was carried in
No. 2 tank of the ship, and which through some neglect of proper
attention to a valve in the pipe line connecting with starboard tank
No. 3, in which all the damaged coffee was stowed, escaped into that
compartment.    There is no dispute as to the damage, or that it came
about as above stated.    The only questions presented are whether
the steamship is relieved from liability for this damage either by rea-
son of the provisions of the bill of lading, or under the third section
of the act of 1893 (2 Supp. Rev. St. p. 81), known as the Harter act,
the libelant claiming that the ship was unseaworthy in structure for
the carriage of dry and liquid cargo at the same time, and also un-
seaworthy because the valve was negligently left open when the ship
sailed.

The steamer was built in 1893, and is one of a recent class, known
as convertible steamers, of which about 20 have been built, designed
to carry liquid cargoes in bulk, as well as dry and perishable car-
goes.    She has a compartment for the stowage of dry cargo only,
next aft of the fore peak; aft of this is a cofferdam or water-tight
compartment formed of two bulkheads; and aft of this five separate
compartments or tanks known as Nos. 1, 2, 3, 4 and 5, separated from
each other by water-tight bulkheads running athwartships, and fur-
ther divided by a longitudinal or fore and aft bulkhead over the
keel, reaching from the skin of the vessel to the upper or main deck
and dividing each of the five tanks in two, termed No. 1 port, No. 1
starboard, and so on respectively.    Aft of No. 5 tank in the stern are
the engine room, bunkers, stokehole, etc.    The between-decks, next
under the main deck, extend from the side of the ship only 10 feet
into the tanks on each side.    The between-decks form the top of that
part of the tanks.    Inside of the between-decks is an open space of
10 feet between them and the longitudinal bulkhead, where the tank
rises higher to the main deck above.    Each of the tanks is 38 feet
fore and aft, and up to the between-decks is 20 feet wide on each side
of the longitudinal bulkhead; above the between-decks, 10 feet wide.
An 8-inch pipe line on each side of the longitudinal bulkhead runs into
and through all the tanks, about 4 feet distant from the longitudinal
bulkhead on each side, and a few inches above the floor of the hold.
There is an offset from the main pipe line in each tank near the after
bulkhead, which runs horizontally about 2 feet, and then turns per-
pendicularly and runs down between the frames of the ship and ter-
minates in an oval shaped bell mouth, about three-quarters of an
inch above the bottom plating.    The bell mouths measure 8 inches
fore and aft and 24 inches athwartships.    The pipe lines are used for
filling and emptying the tanks with liquid cargo through the off-
sets above named, as well as for pumping out any leakage that may
get into any of the tanks.    In each offset there is a Kingston valve,
which is operated from the main deck by means of a spindle, the
screw or thread of which is in the valve, which is completely opened
or closed by 16 turns of the spindle, making a play of the valve up
and down of about 8 inches.    At all times except when in use for
pumping, these valves are designed to be kept tightly closed.

The printed rules of the ship prescribed by the owners required the

tanks and valves to be tested with the pumps every day; and this was usually done at 9 a. m. The test is applied as follows: The pump is started and kept at work upon the main pipe line; the valve connecting with one tank compartment is then opened, all the other valves being closed; if there is water in that compartment it is at once pumped out and discharged over the ship's side, through a canvas pipe attached to the discharge pipe of the pump; if there is no water in that compartment, or after the water, if any, is pumped out, the pump sucks and forces out air which inflates the canvas pipe; this continues until the valve is closed, when a vacuum being created, the canvas pipe collapses. This collapse shows not only that that particular valve is tight, but also that all the other valves on that pipe line are tight; since otherwise air would continue to be pumped out, and the canvas pipe would not collapse. This process is applied to every tank compartment in succession. It is quickly done, 10 minutes being sufficient to test the 10 compartments and valves.

The steamer, having taken on board a part of her return cargo at Buenos Ayres and at Santos, left the latter port (60 miles from Rio), on the 25th of April, with tank No. 2 nearly full of water for ballast. On the way to Rio, in order to sweeten the water in tank No. 2, it was overflowed by forcing water into it through the pipe lines, for four hours, until all the water was supposed to be changed. On the morning of April 26th, at about 9 or 10 o'clock, on coming to anchor in the harbor of Rio, the water in No. 2 tank was lowered two or three feet, by being allowed to run out through the sea cocks. On both these occasions if No. 3 valve had not been tightly closed, No. 3 tank would have been deluged with water. On the contrary, that compartment remained perfectly dry up to May 1st, when the coffee in question was stowed in starboard No. 3 compartment, and the ship sailed from Rio at 3 or 4 p. m. of the same day.

After the loading had been completed at Rio, no water ballast being longer needed, and the emptying of water ballast in the harbor being prohibited, the master, on the evening of leaving Rio, ordered No. 2 tank to be pumped out at 6 o'clock the next morning, after making "sure that all the valves were shut." It was necessary that the valves in the other tanks should be tight in order to prevent flooding the other tanks while the water from No. 2 was running out down to the line of sea level, by its own head (10–12 feet), through the sea cocks, before the pumps were put on. Accordingly, on the next morning, the carpenter, between 6 and 6:30 a. m., after clearing the bilges, went to the spindle of each valve, in the first officer's presence, and turned it first up a little and then down hard. This was finished, he says, about 6:30 a. m. Adamson, the second engineer, says he opened No. 2 valve to let the water run out at about 6:15 a. m., and that he did not himself know whether the other valves had been tried before that. It does not appear who gave Adamson the order to open the valves of No. 2; so that though the first officer says he knows No. 2 valve was not opened until after the other valves had been tried, and that is most probable, it does not appear how the first officer knew it; so that it is not certain that there may not have been some mistake about it.

After the valves of No. 2 were opened the water was allowed to run out until 7:30 a. m., and it was during this interval that the water that caused the damage must have entered No. 3. At 7:30 a. m. the pumps were applied and by 11:30 a. m. the residue of the water was pumped out of No. 2. The same pumping would also remove at the same time the water that had previously entered No. 3. No. 2 tank was then washed out with a small hose, the pumps being still kept going until 5 p. m., when the valves were closed. Meantime, at about 1 p. m., all the other tanks and valves were tested with the pumps, according to the testimony of the first officer and first engineer, and the valves were found to be tight.

The damage to the coffee was discovered on the next morning, when, in order to correct a slight list to starboard, a transfer of bags from starboard to port was made by the captain's orders in No. 3 compartment; and after the removal of about 100 bags, all the bags below were found to be wet and dirty. No. 3 valve was soon tried, both by turning and by the pumps, and it was found to be tight, as it naturally would be, after the test made the preceding afternoon. On examining the mudbox connected with the starboard pipe line, two pieces of wood were found in it; one a piece of narrow hoop about an inch long, not material here; and another piece, which was of soft wood, about 16 inches long, $\frac{1}{4}$ of an inch thick, $\frac{3}{4}$ of an inch wide, and flat on both sides. This bore on the surface indented marks, as of pressure, fitting exactly the two edges of the Kingston valves, at a point about $\frac{1}{4}$ of the way, or two inches, above the bottom; the valves being flat, and circular in outline, but a little wedge-shaped from top to bottom. The valve in No. 3 on subsequent daily tests proved to be tight and in order, until May 5th, when though tight, the spindle turned without affecting the valve, showing that it was broken; and on examination after arrival in New York, a piece of the bottom of the spindle $2\frac{1}{2}$ inches long was found to be broken off, and the threaded part above to be somewhat bent, presumably from the heavy strain in various trials.

On the final hearing, the libelants have contended that the ship was not exempt from liability for this damage under the Harter act, because No. 3 valve, as they claim, was obstructed by this piece of wood when the ship left Rio, and that the ship at that time, therefore, was in an unseaworthy condition. This was not pleaded in reply to interrogatories in the answer calling for the particulars of alleged unseaworthiness, because it was not then known to the libelants; but as the evidence on that subject came out on the examination of the claimant's witnesses, without objection, it should be considered upon its merits.

I cannot, however, sustain the libelants' contention on this point for several reasons. The marks on the piece of wood might have been made by either of the valves on the starboard line, as all the valves are alike. There is no direct evidence that the piece of wood was ever under No. 3 valve; or, if it was, that it got there before the ship left Rio. The libelants' inferences rest wholly upon the testimony of Johnson, the carpenter, that on the morning of the 2d, after a half turn upon the spindle he turned it down hard, and only half a

turn.    But if the bend in the spindle was prior to this damage, the hard turn may have been against that bend, instead of being against the piece of wood.    On the libelants' theory, the piece of wood must have been sucked up with air from beneath the bell mouth, during a pump test of the valves while the ship was in Rio, and got lodged under the valve while it was open, or just as it was closing.    But three witnesses say it could not be sucked up into the large bell mouth with air alone, but only with water behind it; and there was certainly no water in No. 3 tank at Rio; the first officer, moreover, says that before arrival at Rio he cleared out No. 3 tank carefully and that there was no such piece of wood there.    Others say that without water the piece of wood could not be caught on the side of the pipe two inches above the bottom by the slowly-descending valve, but would be forced down to the bottom, and if it was then caught the pump test of that valve and of the other three valves would all have shown that there was a leakage.    If the piece of wood caught under No. 2 valve none of these difficulties would exist; for this wood might easily have been in that tank; it would naturally be carried up the pipe with the last of the water when No. 2 was pumped out; and by floating on the water it would naturally catch at the side and be carried out at the next pumping.    And even if the piece of wood did get under No. 3, it might have come, as the first officer suggests, from the other tank, or from being for some time in the pipe line, or from outside the valve, as Adamson suggests, when No. 3 was opened on May 2d, if the opening was of several turns, as was the customary practice, instead of half a turn, as Johnson states.    Considering that the libelants' theory on this point requires that it must be found as a fact that this piece of wood was under No. 3 valve and that it got there while the ship was at Rio, I think the evidence and circumstances too doubtful, and the inference on these points too uncertain to sustain this contention by such positive findings.

But even if the alleged obstruction of No. 3 valve existed on leaving Rio, that would not constitute unseaworthiness.    For, however it arose, the obstruction, if any, was accidental, of the most temporary character, and sure to be removed by suction upon the first test made with the pumps, and as well as by the exercise of reasonable diligence on any special occasion calling for care during the voyage. It would have been thus removed or else discovered in time to avert damage had the pump test been applied, as required by the owners' rules, either on the day of sailing or on the next morning, before the valves of No. 2 were opened.    Reasonable prudence certainly required an actual test of the valves before opening No. 2 valves, considering the great mass of water that was to be sent through the pipes; and the master's order "to make sure that the valves were shut" perhaps imported this.    If the pump test was not applied, the full 16 turns up and down should have been given as the only other means of detecting an obstruction.    Either of these means was sufficient.    Both were neglected; and after the water was started no sounding of the other tanks by the pumps was made, as might easily have been done. The cause of the damage, therefore, was negligence in the use of the means of safety provided by the owners and a neglect to observe their

written orders in that regard, and not any omission by the owners to provide for all the requirements of a seaworthy ship, and to put her in seaworthy condition. In other words, the fault arose wholly in the "management of the ship," at a port of call and subsequent thereto; it arose during the voyage, and not from anything the owners did or omitted to do, or any lack of diligence by them, to make the ship seaworthy at the commencement of the voyage. The third section of the Harter act, therefore, exempts them from liability, so far as respects this negligence. The case of The Silvia, 64 Fed. 607; Id., 15 C. C. A. 362, 68 Fed. 230,—is quite analogous in this regard. In that case a port had been left open on sailing, through which water was likely to enter, to the damage of cargo in rough weather; and the cargo was afterwards damaged in that way. Although the hatches had been battened down, and ready access to the port was thereby embarrassed, the circuit court of appeals considered that sufficient time and opportunity still remained for reaching and closing the port by the use of reasonable diligence, and therefore ruled that the open port on sailing did not constitute an unseaworthy condition, and that the damage should be ascribed to negligence in not closing the port on the approach of rough weather; and that such negligence was "in the management of the ship" within the third section of the Harter act. See The Sandfield, 79 Fed. 371.

The other particulars of unseaworthiness charged are stowing the coffee "in a compartment where by reason of its construction it was possible for the cargo to be injured by water getting to it from another compartment," and also that "no means were provided to certainly prevent the access of such water, or to detect its presence."

The weight of evidence does not sustain either of these charges. The evidence leaves no doubt that this vessel was most thoroughly and perfectly constructed, upon plans approved by most competent experts. The means provided for detecting water in the cargo tanks were simple, quick and easy; and the means for the removal of water greatly superior to those on ordinary cargo steamers. It is a common practice in all modern steamers, and deemed unobjectionable, to carry dry cargo in compartments adjoining water-ballast tanks. Tank No. 2 was in this case in use for a short time for water ballast. The only distinguishing circumstance in that regard on this steamer is the pipe line, which, with its offsets, connects the different tanks. But these connections are of the highest utility and economy in the carriage of liquid cargo, and essential, therefore, to the service for which the ship was designed. In planning the ship to carry dry cargo also, I see no reason why it is not as legitimate to rely on valves in the offsets, and on proper attention to the valves to prevent the incursion of water or other liquid into the dry tanks, as it is in ordinary vessels to rely on the proper closing of ports and sea cocks for the same purpose. Through negligence in the use of any of these openings, damage may arise to cargo for which the shipowner must pay, except in so far as he is exempted by statute or by contract. The same principle is applicable to all. So long as such pipe lines and valves are reasonably adapted to the double service for which the ship is designed, and the use of them is so simple, easy and certain as to

require only ordinary diligence for the protection of dry cargo, as the proof shows in this case, the ship cannot be held unseaworthy in construction or in stowage, merely because damage may arise from inattention to the valves.

Much testimony was taken on the question whether a sounding pipe should not also have been provided for each tank, for the detection of water in the bottom, by a rod which could be inserted through the sounding pipe from the deck, whenever desired. Several experts examined by the libelants were of opinion that such sounding pipes should have been provided; a greater number were of opinion that the pipe line and Worthington pumps were more than an equivalent for such sounding pipes, and were not required either by reasonable prudence or by any existing regulations; and such is undoubtedly the weight of evidence.

Sounding pipes, moreover, are of comparatively recent use; and in stormy or wet weather, it is said, they cannot be advantageously used with facility. In cases like this, sounding pipes would not prevent the damage, but only discover the damage after it was done. There is no reason to suppose that sounding pipes would have been of the least use, or would even have been resorted to, had they been provided. Had there been any thought of testing the tanks for water during the hour on the morning of May 2d, when this damage was done, it would have been as easy to make that test by the pumps as by a sounding rod; the test by the pumps was not made, because it was not suspected that any valve was open so that any water could get into any one of the eight compartments in which cargo was stowed; sounding pipes, if provided, would not have been used, for the same reason; so that the absence of them cannot be supposed to have contributed to this damage, and would be therefore immaterial even if they had been required.

I am of opinion that this damage is covered by the exemptions of the third section of the Harter act, and that the libels must, therefore, be dismissed, with costs.