### THE WILDCROFT.

#### (Circuit Court of Appeals, Third Circuit. May 23, 1904.)

#### No. 21.

**1. SHIPPING—DAMAGE TO CARGO—EVIDENCE AS TO CAUSE.**

A ship may sustain the burden of proof resting on her to show that cargo damage was due to a cause for which she is not liable by circumstantial evidence as to the manner in which the water causing the damage entered the hold, and in the absence of direct evidence the court is justified in adopting her theory in that respect, where the facts and circumstances shown are consistent with such theory and not consistent with any other.

**2. SAME—EXEMPTION UNDER HARTER ACT—PRESUMPTION OF SEAWORTHINESS.**

The casting of the burden of proof on one party or the other in a given case does not destroy the presumptions in favor of a party which exist under the general law of evidence. So a shipowner, claiming exemption from liability for cargo damage under section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), has the burden of proving the seaworthiness of the vessel; but, in the absence of evidence to the contrary, such burden is met prima facie by the presumption that he performed his duty in making her seaworthy at the commencement of the voyage.

**3. SAME—FAULT IN MANAGEMENT OF VESSEL.**

Where a ship was at the commencement of a voyage in all respects seaworthy, and properly manned, equipped, and supplied, damage to a sugar cargo from fresh water which escaped into the hold where the sugar was stowed while the cargo was being discharged, by reason of a valve having been improperly left open while water from the river was being pumped into the engine tank, was due to a fault in the management of the vessel, for which she is exempted from liability by section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]).

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

See 124 Fed. 631, 126 Fed. 229.

¶ 2. Statutory exemption of shipowners from liability, see note to Nord-Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11.

H. L. Cheyney, for appellant.

J. Parker Kirlin, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from a final decree in admiralty, by the District Court of the United States for the Eastern District of Pennsylvania, dismissing the libel of the appellant.

The suit was brought by appellant, to recover damages alleged to have been sustained with respect to a shipment of sugar on the steamship "Wildcroft," from Cuba to Philadelphia. The libelant was consignee of the sugar. The libel recites that the cargo of sugar was delivered to the steamship in good order and condition, to be carried to the port of Philadelphia, and there delivered in the same good order and condition, and that upon the arrival of the steamship at Philadelphia, a large portion of said cargo was greatly damaged by contact with water. The libel charges that said damage was due to the unseaworthiness of said vessel at the commencement of said voyage.

The defense here relied upon is, that the goods were carried forward under bills of lading that contained this clause: "All accident, loss and damage whatsoever from machinery, boilers and steam navigation, or from perils of the seas and rivers, or from any act, neglect or default whatsoever of the pilot, master or mariners, being excepted;" that the vessel was in every way seaworthy at the commencement of the voyage, and that the damage to the cargo was caused by perils of the sea and navigation, within the exceptions in the bills of lading. The alternative defense is urged, that if the damage was caused or contributed to by any faults of those in charge of the vessel, the vessel was protected from responsibility therefor, by the terms of the act of Congress, approved February 13, 1893, called the "Harter Act." Act Feb. 13, 1893, c. 105, § 1, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946].

We take the following statement of the case from the opinion of the learned judge of the court below:

In April, 1901, the Wildcroft, having discharged a cargo of coal in Havana, proceeded to Cardenas and Matanzas, where she loaded sugar in bags, consigned to the libelant. The sugar in controversy was stowed in No. 3 and No. 4 holds, and some of it was found, while being discharged, to have been damaged by water. It does not appear precisely how much of the cargo was damaged. Apparently the bulk of it was sound. But, at the top of No. 3 hatch, on the starboard side, the sugar was wet all across the hatchway to a depth of about 8 feet. Under the starboard ventilator of the same hold, a burrow, caused by water, extended down about 8 feet. Under this there was a layer of sound cargo down to a point about 3 feet from the bottom. On the bottom of No. 4 hold also, as well as of No. 3, there was a layer of damaged cargo about 3 feet thick. There was no damage elsewhere in No. 4. In each hold the damage at the bottom was on the starboard side of the tunnel. The damage at the top of No. 3 hold was caused by salt water that found its way into the hold on April 19th in the manner hereafter stated. The damage at the bottom of the holds, however, was caused by fresh water, the marks on the bulkheads showing that both holds had been flooded to a height of 2 to 4 feet. In order to determine how water, either salt or fresh, may have found its way into these holds, it is desirable to refer to the construction of the vessel in some respects, and also to the circumstances of the voyage. The Wildcroft has four holds, two on the fore side of the engine room tank, and two on the after side.

No. 3 and No. 4 holds are on the after side of the engine room, and are separated from each other by a grain-tight bulkhead. A water-tight bulkhead separates No. 3 hold from the engine room, and a water-tight bulkhead also separates No. 4 hold from the peak tank aft. The flooring under No. 3 and No. 4 holds is not water-tight, but is better than grain-tight. The average depth of the bilges below the flooring is 2 feet 6 inches. As the bulkhead between No. 3 and No. 4 holds is pierced by limber holes, these two compartments are practically one, so far as the passage of water is concerned. The vessel has five tanks: No. 1 is under No. 1 hold, No. 2 under No. 2 hold, No. 3 under the engine room, No. 4 under No. 3 hold, No. 5 under No. 4 hold, and the after peak tank is aft of No. 5. All these tanks, excepting the after peak tank, are built on the double cellular principle. No. 1 and the after peak tank were empty during all the voyage from Baltimore to Havana, and thence to Cardenas, Matanzas and Philadelphia. Nos. 2, 3, 4 and 5 tanks were filled with water for ballast at Havana after the discharge of the cargo, but when the vessel arrived at Cardenas they were pumped dry, and remained dry during the rest of the voyage to Philadelphia.

After the discharge of cargo at Havana, the sluices, holds and bilges on the ship were overhauled and cleaned. At Cardenas part of the cargo was loaded, the rest being taken on board at Matanzas. After leaving this port, each hatch was protected with a wooden cover and with three tarpaulins that were securely battened down with iron bars and wedges. On leaving Matanzas, the vessel drew about 21 feet 6 inches fore and aft, and was then in every respect seaworthy, and properly manned, equipped and supplied. The hatches were not taken off until after the vessel reached Philadelphia. During the voyage the weather was exceptionally severe, culminating on April 19th in heavy gales, tropical rain and high seas, the result being that the vessel rolled and pitched heavily, and shipped large quantities of water on deck. About 3 p. m. on that day a heavy sea tore away the three tarpaulins that covered No. 3 hatch and the starboard ventilator cover at the forward part of the hatch. New tarpaulins were lashed temporarily over the hatch as securely as the violent weather would permit, and a spare cover was put over the ventilator, but the weather did not moderate sufficiently until 6 or 7 o'clock the next morning to permit the crew to fix the tarpaulins permanently over the hatch, and thus to make it again as secure as when the vessel left Matanzas. During this interval, the vessel shipped heavy seas, the downpour of rain continued, and a considerable quantity both of sea water and of rain water entered No. 3 hatch through the joints of the hatch and down the ventilator hole. Not much water reached the bottom of either hold at this time. Both holds were sounded night and morning during all the voyage, and no more than the usual amount of water was found, 2 to 4 inches. The vessel arrived at Philadelphia on April 22d, and was taken to the libelant's wharf to discharge her cargo. Before the discharge was begun, the sugar directly under the hatch of No. 3 was found to be damaged by water. All the bags across the hatchway were wet. Under the ventilator whose cover had been washed off there was a burrow about 8 feet deep between the bags where the water had run down. The discharge began on April 23d and was continued without further incident until April 29th. At 7 a. m. of that day, in accordance with the standing orders that soundings should be taken night and morning, the pumps connecting with No. 3 and No. 4 holds were started and were worked for 15 minutes, but nothing was pumped out. About 3 p. m., however, the stevedore that was discharging the vessel, reported to the chief officer and the chief engineer, that there was water in hold No. 4. Soundings were taken immediately, and between 5 and 6 feet of water were found. There was no water in the engine room bilge, however, and the sluices in the tunnel connecting with No. 3 hold and the after wells of the engine room were then opened, and the water and molasses were pumped out, both holds being dry by midnight. The chief engineer tasted the liquid in the bottom of the hold, and found it to be molasses and fresh water. In order to determine whether any of this water had come into the ship through a leak in the hull, or in any of the ballast tanks, the vessel was thoroughly examined by Lloyd's surveyors in Philadelphia immediately after the cargo had been discharged, and before repairs of any kind had been made. No leak or injury to the hull or tanks was found, and the surveyors thereupon gave the vessel a certificate of seaworthiness.

The fresh water in the holds is accounted for as follows: On the morning of April 29th, No. 3 engine-room tank was filled with fresh water from the Delaware river for ship's purposes. It began to flow into the tank at 10 o'clock and the flow was uninterrupted for three hours. A drawing showing the arrangement of pipes, connections and valves involved in this explanation, is annexed to the claimant's testimony. This drawing was prepared by a consulting engineer, who examined the vessel in London in June, 1901, before any repair, alteration or change in arrangement had been made in any of the pipes, cocks or valves in use on April 29th, when the damage was done. No. 3 tank, just referred to, is under the engine room. It is filled by opening a valve, A, in the ship's side, which admits water from the river into the tank —filling pipe AB. This pipe is connected, on its continuation below the point B, with valves in the tank-distribution box. From this box another pipe leads to the tank top. (Neither the tank distribution box nor the pipe connecting it with the engine-room tank are shown on the plan, as they have no connection with, or relevancy to the present controversy.) There is no direct connection between this tank and No. 3 and No. 4 holds. There is, however, a pipe connection, C, governed by a cock at D, that leads from the tank-filling pipe to the service-donkey, and this in turn is connected with another distribution chest, from which a pipe is led to No. 3 hold for the purpose of pumping out the bilges of that hold. This pipe is indicated by the letters EFG. At the head of this suction pipe in the distribution chest is a non-return valve, E. This valve and the seat on which it rests are made of gun metal. The valve apparently works on a hinge, so that it opens when suction is applied to it from the top by the pumps, but when the suction ceases, the valve falls back on its seat and prevents anything from entering the pipe which it covers. If, therefore, any foreign substance, such as a small piece of wood, had been drawn up the pipe FG when the pumps had been worked last on the limbers of No. 3 hold, and had become caught in the valve E, so that the valve had been wedged open, and if at the same time the cock D in the donkey service or branch pipe were open, it is apparent that water flowing from the river into the tank-filling pipe AB, leading to the engine room, would also flow through CD to the distribution chest, and down the valve E and the suction pipe FG leading to the limbers in No. 3 hold, and thence into No. 4 hold; for, as already stated, No. 3 and No. 4 are practically one hold so far as water communication is concerned. If these cocks and valves, D and E, or either of them, had been properly closed during the process of filling the engine-room tank, it would not have been possible for any water to find its way into No. 3 and No. 4 holds.

I think, therefore, that the damage to the sugar was caused by the water that went down No. 3 hold during the storms on the voyage, and by the water that flowed into the hold through the pipe line on April 29th, in the manner just described. Indeed, it is impossible that the damage could have occurred in any other way, unless some of the water that entered through No. 3 hatch on April 19th passed down the sides of the ship into the holds, and I do not think the testimony justified such a finding.

The findings of fact contained in the foregoing opinion, are not only accepted as prima facie conclusive, but, as the result of a careful examination of the testimony sent up in the record, are approved, as being founded upon the weight of the evidence. The only question in the case is, as counsel for appellant say, whether the claimant has shown such facts as to the cause of damage, as to entitle the ship to exemption under the "Harter Act."

We do not intend, nor is it necessary, to recite the evidence at length, upon which these findings are based. It suffices to say, that it clearly appears that the ship was water-tight when the cargo was loaded and when she sailed from Cuba, and that no water reached the bottoms of either No. 3 or No. 4 hold during the voyage. As we have seen, no claim was made for damage to the top of the sugar,

occasioned by the salt water that found its way through the hatches of No. 3 hold during a gale, which washed away the tarpaulins covering those hatches. This damage was clearly due to a peril of the sea. The testimony is, that both of these holds were sounded night and morning during the entire voyage, by the carpenter, and the soundings disclosed merely the usual amount of water in the bilges,—from two to four inches. All of the testimony in this respect is uncontradicted, and no facts are shown from which any other conclusion can be drawn, than that the water which came into the bottom of these holds, to the depth of several feet, doing the damage in question, came in after the early morning of the 29th of April, and before the close of that day, while the cargo was being discharged at the wharf in Philadelphia. It is not disputed that the water was fresh water, such as was the water in the Delaware river, in which she was lying. In connection with these facts, it was shown by the testimony that the sea-cock for filling the engine room tank was open at ten o'clock that morning, and kept open for a period of three hours, and that if two certain cocks, fully described in the evidence and pointed out by the learned judge of the court below, were left open by accident or design, there would be a free flow of water from the open sea-cock into the bilges of hold No. 3. Directly after the filling of the tank and the closing of the sea-cock, water to a considerable depth was reported in holds No. 3 and No. 4. This sea-cock had not been open from the time the cargo was put on board in Cuba until, as just stated, on the morning of the 29th of April, at Philadelphia. We think the court below was fully justified in its finding, that the damage here in question was due to "the water that flowed into the hold through the pipe line on April 29th, in the manner just described," and that "it is impossible that the damage could have occurred in any other way."

It is true, that the evidence upon which the court makes this finding, is in part circumstantial. We see no reason, however, why circumstantial evidence should be excluded from the consideration of the court, in its determination of the issue before it. Its probative force in this case could not be disregarded. It is certainly very strong, if not absolutely conclusive, and when considered in connection with other testimony in the case, fully warranted the learned judge in the conclusion at which he arrived. The gravamen of complainant's contention seems to be, that the court were not justified in relying upon such testimony. He objects that the claimant has not proved "a single fact as to the cause of damage, but he had a theory which the court accepted as a fact." But if all the facts in a case are consistent with one theory, explaining the ultimate fact sought to be proved, and are inconsistent with every other theory attempting such explanation, we have the very foundation upon which all circumstantial evidence rests, by which the most important issues involving life or property may be and are every day determined. And so the learned judge of the court below says:

"I adopt the theory propounded by the ship to account for the presence of the water; indeed, I cannot conceive of any other theory that is consistent with the facts, while this agrees with them all and is in conflict with none."

If the circumstances were such, that the liability of the ship depended upon the establishment of the fact that the damage in question was done by water that came through the open sea-cock on the morning of April 29th, and by the accidental or negligent opening of the two cocks, E and D, reached hold No. 3, can there be any doubt as to the sufficiency of this evidence for that purpose? We think not, and so also, we have no doubt as to its sufficiency, where the exemption of the ship from liability depends upon the same evidence.

Each of the bills of lading under which the cargo was received and carried, contains the following clause:

"It is mutually agreed that this shipment is subject to all the terms and provisions of, and all the exemptions from liability contained in the Act of Congress of the United States, approved the 13th day of February, 1893."

The third section of the act thus referred to, and known as the "Harter Act," is, in part, as follows:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for the damage or loss resulting from faults or errors in navigation or in management of said vessel."

We have no doubt that the court below was right in its conclusion, that the damage thus occasioned resulted from faults or errors in navigation or in the management of the ship. Whatever may be said as to faults in navigation, there can be no question, that the flowing of the fresh water into the hold, where the sugar was stowed, from the open sea-cock, on the morning of the 29th of April, was through the fault of the "management" of the ship, by the officers in charge. At that time, the steamship was in no sense under the control or management of her owners, or those representing them, other than the officers and crew. We agree with the general proposition laid down in several cases, that, for the purposes of the exemption of this act, the "management" of the ship extends from the loading and sailing of the ship to the delivery of the cargo. However this may be, as a general proposition, we are clearly of opinion that the fault, to which the damage was due in this case, was one solely in the "management" of the ship. The condition upon which this exemption from liability can be invoked under the third section of the "Harter Act," is that the owner of the vessel shall have exercised "due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied." In International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830, Mr. Chief Justice Fuller, delivering the opinion of the court, said:

"We repeat, that even if the loss occur through the fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised, and it is for the owner to establish the existence of one or the other of these conditions."

See, also, The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65.

The casting of the burden of proof on one party or the other in a given case, does not destroy the presumptions in favor of a party,

which exist under the general law of evidence. Presumptions are a sort of proof and a substitute in certain stages of a case for affirmative testimony. A disputable presumption may operate as a prima facie case upon a particular point. Thayer's Prelim. Treatise on Evidence, p. 365. A presumption operating as a prima facie case, stands as proved until the prima facies is destroyed by controverting evidence. In the case before us, there is a presumption, that the owner of the steamship performed his duty, in making her seaworthy, and properly manning, equipping and supplying her for the voyage she was about to make. This presumption will support the burden of proof imposed, until it is overthrown or controverted by some evidence. The Chief Justice, who delivered the opinion of the Supreme Court in Int. Nav. Co. v. Farr, etc., supra, used this language in the case of The Chattahoochee, 173 U. S. 540, 550, 19 Sup. Ct. 491, 495, 43 L. Ed. 801:

"By the third section of that act" (the "Harter Act") "the owner of a seaworthy vessel (and, in the absence of proof to the contrary, a vessel will be presumed to be seaworthy) is no longer responsible to the cargo for damage or loss resulting from faults or errors in navigation or management."

We think there is no conflict between the two statements made by the learned Chief Justice. The burden of proving seaworthiness rests upon one who wishes to avail himself of the exemption of the third section of the act, and the presumption of fact alluded to, where not controverted, sustains that burden, or, in case of controversy, may help to sustain it.

In this case, libelant produced no controverting testimony; nothing to show any unseaworthiness, general or special. Claimant did, however, in support of the presumption, prove general seaworthiness, and by direct and circumstantial evidence, show that the sea-cock and valves, through the accidental or negligent opening of which it has been found that the damage occurred, were in good order and condition at the commencement of the voyage, and up to the time of the flooding of the hold on the 29th of April. This is testified to distinctly and affirmatively by both the captain and chief engineer, from their personal knowledge and inspection, and there is no controverting testimony produced by the libelant.

The libelant contends that, because this testimony of the captain and chief engineer were to the effect that of their "personal knowledge and inspection, the tank filling pipe, the cocks on it and on the connections between it and the distribution chest, both during the voyage and while the vessel was discharging cargo in Philadelphia, were in thorough working order and condition," it does not follow that the cocks, D and E, were closed at the time of sailing. But it is in evidence, that the water could not have found its way to hold 3, if the valve, D, had been closed, even if the valve, E, had been held open by something accidentally under it. Now valve D was located in the engine room, and was easily accessible, and, according to the testimony, it was worked every morning and evening, in pumping out the bilges of the lower hold, when it was necessarily opened. If at any time after said pumping, it was left open, this was clearly a fault in the "management" of the ship during the voyage. So also, if

valve E, which was testified to have been inspected and found in good condition and working order at the commencement of the voyage, was held open by the accident of some foreign substance being sucked under it, this accidental happening was in the "management" of the ship, and could not have been provided against by those whose duty it was to look after its seaworthiness and general condition before the commencement of the voyage. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Mexican Prince (D. C.) 82 Fed. 488.

Accepting, therefore, the findings of fact made by the court below, as well founded, we conclude that the damage to the cargo consigned to the libelant was due to a fault in the "management" of the vessel, within the meaning of the exemption in the third section of the act of Congress of February 13, 1893, and that the vessel was shown to have been seaworthy at the time of the loading of the cargo, both generally and in respect to the particular matters involved in causing the damage complained of.

The decree of the court below is affirmed.