COMPAGNIE MARITIME FRANÇAISE v. MEYER et al.

(Circuit Court of Appeals, Ninth Circuit. February 4, 1918.)

No. 3018.

1. SHIPPING ⬥132(5)—DAMAGES TO CARGO—UNSEAWORTHINESS OF VESSEL.
   Proof that a French bark, within four days after leaving Brest on a voyage from Rotterdam to San Francisco, without having encountered weather which was unusual at the season, was found to be leaking, so that she had to be pumped each day thereafter until she reached the vicinity of Cape Horn, when, meeting stormy weather, the leak increased, and she was obliged to seek a harbor of refuge, and that, when her cargo was discharged for repairs at Buenos Ayres, one rivet was found to be gone from her bottom, others were loose, cement was broken from some of her plates, and some were bent, *held* sufficient to show that she was unseaworthy at the beginning of the voyage, although she was surveyed at that time, and to render her liable for the damage to her cargo.

2. SHIPPING ⬥137—DAMAGE TO CARGO—LIABILITY OF VESSEL—HARTER ACT.
   The exemption of a vessel and owner from liability for damage to cargo resulting from faults or errors in navigation or management of the vessel, granted by section 3 of the Harter Act (Act Feb. 13, 1893, c. 105,

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

248 F.—56

27 Stat. 445 [Comp. St. 1916, § 8031]), is on the distinct condition that the owner shall show that the vessel was in all respects seaworthy and properly manned, equipped, and supplied for the voyage, or, if that cannot be established, that he used due diligence to make her so, and this is not sufficiently shown by proof of visual inspection only, without making further tests, of a vessel about to sail from Rotterdam, around Cape Horn, to San Francisco.

Appeal from District Court of the United States for the First Division of the Southern Division of the Northern District of California; Robert S. Bean, Judge.

Suit in admiralty by the Compagnie Maritime Française, owner of the French bark Duc D'Aumale, against Hermann L. E. Meyer, George H. C. Meyer, Hermann L. E. Meyer, Jr., J. W. Wilson, and John M. Quaile, partners under the style of Meyer, Wilson & Co., and cross-libel against the vessel. Decree for respondents on cross-libel, and libelant appeals. Affirmed.

The French bark Duc d'Aumale was chartered by the appellees to carry a cargo of coke and pig iron from Rotterdam to San Francisco. On September 19, 1907, she left Rotterdam, and was towed to Brest, and thence on September 24th she proceeded on her voyage. Five days later she encountered squally weather, and on the 29th 23 centimeters of water were found in her hold, and thereafter water continued to come in at the rate of one centimeter an hour, necessitating pumping 20 minutes each morning and evening. The vessel did not put into a port for repairs, but continued on her voyage. On November 22d, when she had arrived at 49° 37' south latitude, and 66° 21' west longitude, and in the neighborhood of Cape Horn, she encountered stormy weather, and a high sea, which caused her to roll heavily. The leak increased until there were 1 meter and 65 centimeters of water in the hold. The master then made for the Falkland Islands, where, on November 25, the ship was beached at Roy Cove. There she remained aground until February 13, 1908, having 14 feet of water in her hold. She was finally towed to Port Stanley, where she remained until April 5, 1908, and thence she proceeded under her own sail to Montevideo, and thence to Buenos Ayres, where she arrived on May 5th. There the cargo was discharged, and the ship was placed in dry dock for repairs. It was found that one rivet was gone from her bottom, and several other rivets were loose and leaking; that cement was broken from the butt ends of several plates, and some plates were bent. On July 18, 1908, the vessel sailed with her cargo for San Francisco, where she arrived November 19, 1908, with her cargo badly damaged. There the owners sued the appellees for the freight, and the appellees libeled the ship on a claim for damages to the cargo. The two suits were consolidated, and tried as one. The court below found that the vessel was unseaworthy at the commencement of the voyage, either because of a defective hull, or the improper stowage of her cargo, or both, and a decree was entered in favor of the appellees for the sum of $2,242.72 and costs.

Andros & Hengstler, Louis T. Hengstler, and Golden W. Bell, all of San Francisco, Cal., for appellant.

Edward J. McCutchen, Ira A. Campbell, and McCutchen, Olney & Willard, all of San Francisco, Cal., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] We think that the evidence sufficiently shows that the vessel was unseaworthy when she started upon her voyage from Rotterdam. The evidence produced to show that she was at that time seaworthy as to her hull consists in the fact that before loading she was surveyed

by two experts appointed by the French consul at Rotterdam, also by the surveyor to the Bureau Veritas, and by the agents of the owner, and the testimony of those who made the inspection. The evidence that she was unseaworthy is the fact that so soon after starting upon her voyage, and without encountering unusual weather, she sprung a serious leak, which leak increased when the usual stormy conditions in the neighborhood of Cape Horn were met, and the condition of her bolts and plates when she was placed upon the dry dock at Buenos Ayres. That the weather which resulted in the first leak was not unusual is shown by the log, which is admitted to be correct. The log shows that up to the first watch of September 28, 1907, all sails had been set. The log then recites:

In the first watch: "Squally weather, strong rain; wind blows to the southwest and shifts to the northwest; gaff topsail and main jib torn; royals and upper topgallant sails and staysails and spanker taken in." In the next watch: "The same kind of weather; strong breeze; a large swell from the northwest; the topgallant sails taken in; unbent the main jib; violent squalls; strong winds; heavy sea; set the topgallant sails and mizzen staysail." Next watch: "Cloudy weather and squally; strong breeze; heavy sea from the west-northwest; the same sail as during the preceding watch." Next watch: "Squally weather: strong breeze; furled the mainsail at 6 o'clock." Next watch on the same day: "The same weather; very strong swell: violent squalls." The next day, "midnight of the 28th to midnight of the 29th," in the first watch: "Fine weather; some squalls; strong breeze, becoming less at the end of the watch." Second watch: "Fine weather; fine breeze, set the mainsail, royal, spanker, and staysail."

The evidence was that such weather was not unusual or unexpected in that vicinity at that season of the year. It has been held by this court and by other courts that the development of a serious leak, occurring from no mishap or accident within a short period of time from leaving port, is evidence from which it may be presumed that the vessel was not seaworthy at the time of leaving. In The Warren Adams, 74 Fed. 413, 20 C. C. A. 486, Judge Wallace, for the Circuit Court of Appeals for the Second Circuit, said:

"Where a vessel, soon after leaving port, becomes leaky, without stress of weather, or other adequate cause of injury, the presumption is that she was unsound before setting sail."

Other decisions to the same effect are Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 94 Fed. 180, 36 C. C. A. 135; The Aggi (D. C.) 93 Fed. 484; The Artic Bird (D. C.) 109 Fed. 167; Oregon Bound Lumber Co. v. Portland & Asiatic S. S. Co. (D. C.) 162 Fed. 912; Steamship Wellesley Co. v. C. A. Hooper & Co., 185 Fed. 735, 108 C. C. A. 71; Carolina Portland Cement Co. v. Anderson, 186 Fed. 145, 108 C. C. A. 257; Benner Line v. Pendleton (D. C.) 210 Fed. 67.

The appellant contends that, if the presumption of unseaworthiness is to be indulged upon facts such as those which controlled decision in the cases above cited, it is no stronger than the presumption of seaworthiness which obtains as a matter of law, and as expressed in The Chattahoochee, 173 U. S. 540, 550, 19 Sup. Ct. 491, 495 [43 L. Ed. 801], where Mr. Justice Brown, referring to the Harter Act said:

"By the third section of that act [Comp. St. 1916, § 8031] the owner of a seaworthy vessel (and, in the absence of proof to the contrary, a vessel will

be presumed to be seaworthy) is no longer responsible to the cargo for damage or loss resulting from faults or errors in navigation or management."

But the presumption which was affirmed in the Chattahoochee Case was obviously only a prima facie presumption such as that which was recognized in Lunt v. Boston Marine Insurance Co. (C. C.) 19 Blatchf. 151, 6 Fed. 562, and Pickup v. Thames Insurance Co., 3 Q. B. Div. 594, a presumption which obtains in the absence of proof to the contrary, and which may be overcome by proof that the vessel developed a seriously leaky condition within a short time after leaving port, showing that she must have been unseaworthy before the voyage commenced. It is to be observed, however, that the language of Mr. Justice Brown in the Chattahoochee Case was relied upon in The Wildcroft, 130 Fed. 521, 65 C. C. A. 145, in which the Circuit Court of Appeals for the Third Circuit held that there is a presumption that the owner of a steamship performed his duty in making her seaworthy, and properly manning, equipping, and supplying her for the voyage she was about to make, and that this presumption will support the burden of proof imposed until it is overthrown or controverted by some evidence. But on the appeal from the decision, that doctrine was rejected by the Supreme Court in The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794, where the court said that the owner "is bound to furnish a seaworthy and properly equipped ship for the purpose of the voyage. Whether he has done so is a matter peculiarly within his own knowledge. * * * The law says, in substance, that when the owner can show that he has discharged this duty he shall be relieved from errors of navigation and management on the voyage, over which he has not such direct control," and while affirming the decision of the Circuit Court of Appeals, the Supreme Court said:

"But we are unable to agree with the views expressed in the opinion of the learned Circuit Court of Appeals, to the effect that where a ship owner seeks the protection of the immunity afforded by the Harter Act under section 3, reliance may be had upon the presumption of law that the vessel was seaworthy at the beginning of the voyage, and that it is only in cases of conflicting proof that the burden is imposed upon the shipowner of establishing by testimony the seaworthiness of the vessel, or due diligence in that behalf, in order to have the benefit of the act."

[2] The appellant contends that assuming the ship to have been unseaworthy on leaving Rotterdam, the appellant, having used due diligence to make her seaworthy, is not liable, for the reason that the proximate cause of the damage was not unseaworthiness but fault in navigation. The third section of the Harter Act provides that, if the owner shall exercise due diligence to make the vessel in all respects seaworthy, neither the vessel nor her owner or owners shall be held responsible for damages or loss resulting from faults or errors in navigation or in the management of said vessel. It is said that the fault in management or navigation in the present case was the failure of the master to take the vessel to an accessible port for repairs as soon as he discovered her leaking condition, and that he was at fault in proceeding on the voyage around the Horn, and subjecting the vessel to

the severe strain of the stormy weather usually there encountered. In Int. Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830, the court said:

"We repeat that, even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised, and it is for the owner to establish the existence of one or the other of these conditions."

In The Wildcroft, 201 U. S. 378, 388, 26 Sup. Ct. 467, 469 (50 L. Ed. 794), the court said:

"Where the statute has given immunity against such loss by reason of error in navigation or management, it does so upon the distinct condition that the owner shall show that the vessel was in all respects seaworthy and properly manned, equipped, and supplied for the voyage, or, if this cannot be established, that he has used due diligence to obtain this end."

In the present case the court below was of the opinion that the testimony of the experts who inspected the vessel before her voyage began was not conclusive; that the inspection was general, largely visual, and not particularly of the parts which proved defective. The evidence, we think, sustains that conclusion. There is no testimony that any of the inspectors made other than visual examination, except the witness Le Roy, who testified that he sounded with a hammer the ship's sides, and all accessible rivets, including those of the hull, but that he could not examine all rivets, for the reason that at that date, August 27, 1907, there was cargo in the hold. We are not convinced, therefore, that the appellant has met the burden of proof which rested upon it to show that it exercised due diligence in view of the contemplated voyage. In The Millie R. Bohannon (D. C.) 64 Fed. 883, Judge Brown said:

"'Due diligence' requires a carefulness of inspection and repair proportionate to the danger."

And in The Southwark, 191 U. S. 1, 16, 24 Sup. Ct. 1, 6 [48 L. Ed. 65], it was said that if, by failure to adopt proper and reasonable tests and furnish the required proof, "the question of the ship's efficiency is left in doubt, that doubt must be resolved against the shipowner, and in favor of the shipper." In The Abbazia (D. C.) 127 Fed. 495, it was said that the diligence required "is diligence with respect to the vessel, not in obtaining certificates," and in a number of cases the certificates of surveyors and inspectors giving high rating have been disregarded where vessels have been found unseaworthy in fact. The Folmina, 212 U. S. 354, 360, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Ninfa (D. C.) 156 Fed. 512, 525; The Rappahannock, 184 Fed. 291, 107 C. C. A. 74. The statute so exempting the owner from a general obligation of furnishing a seaworthy vessel is strictly construed. The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; The Irrawaddy, 171 U. S. 187, 192, 18 Sup. Ct. 831, 43 L. Ed. 130; Benner Line v. Pendleton, 217 Fed. 497, 505, 133 C. C. A. 349; The Jeanie, 236 Fed. 463, 471, 149 C. C. A. 515; The Germanic, 124 Fed. 1, 5, 59 C. C. A. 521. In the Irrawaddy Case the court said:

"Plainly, the main purposes of the act were to relieve the shipowner from liability for latent defects, not discoverable by the utmost care and diligence."

In Nord-Deutscher Lloyd v. President, etc., of Ins. Co., 110 Fed. 420, 49 C. C. A. 1, the court said:

'The obligation of due diligence to make the ship seaworthy is in all respects the same as before the Harter Act, which does not establish any new rule of diligence. The shipowner cannot now, any more than before, rely upon external appearances in place of known tests, nor can the mere selection of competent persons to inspect satisfy the requirement of due diligence."

In the Alvena, 79 Fed. 973, 25 C. C. A. 261, it was held that, in the inspection prior to the voyage, failure to take up one of four ceiling boards in a passageway over the limber spaces, underneath which the leak occurred, in order to examine the cement, was a lack of due diligence. That the inspection in the present case was not such as the Harter Act contemplates is strongly suggested by the fact that the vessel sprung a leak five days after starting upon her voyage, and the condition in which she was found when she was overhauled in Buenos Ayres.

The decree is affirmed.