THE JOHN TWOHY.

(District Court, E. D. Pennsylvania. June 12, 1917.)

No. 10 of 1916.

1. SHIPPING ☜116—LIABILITY OF VESSEL—SHORTAGE IN DELIVERY—EVIDENCE.
    Bills of lading are strong prima facie evidence of the weights given therein, and the burden of showing an inaccuracy in case of a short delivery rests on the carrier; but the presumption may be met by clear and convincing proof that all the goods taken on board were delivered.

2. SHIPPING ☜132(3)—LIABILITY FOR DAMAGE TO CARGO—BURDEN OF PROOF.
    The burden of proof to show that damage to cargo from sea water was due to perils of the sea, within the exception of the bill of lading, rests on the vessel.

3. ADMIRALTY ☜124—COSTS—RECOVERY ON ONE OF TWO CLAIMS.
    A libelant, who sues on two claims and recovers on only one, is nevertheless entitled to recover costs, where both were prima facie good, so that the burden of proof rested on the respondent, and both were contested.

In Admiralty. Suit by T. M. Duche & Sons, Limited, against the schooner John Twohy. Decree for libelant on one cause of action, and for respondent on one.

Harrington, Bigham & Englar, of New York City, and Conlen, Brinton & Acker, of Philadelphia, Pa., for libelant.

Howard M. Long, of Philadelphia, Pa., for respondent.

DICKINSON, District Judge. The respondent schooner was chartered to carry a cargo of bones from Buenos Aires to this port. The

charter party contained the usual provisions as to the condition of the vessel. The freight earnings were based upon cargo tonnage. A dispute arose over the amount. This was adjusted by an agreement upon the deduction to be made from the outturn weight because of the wet condition of a part of the cargo and a settlement made for the net outturn weight thus determined. With this dispute the court has nothing to do. The consignees then filed a libel against the vessel, based upon the double claim of a failure to deliver part of the cargo loaded upon the vessel and the damaged condition of part of the cargo which was delivered. The intake, as evidenced by the statements of the bill of lading, contrasted with the actual weight of the outtake, shows on its face a net shortage of 149,069 pounds. The money sum claimed for short delivery is $1,613.14. The money claim for damaged cargo is $932.24, based upon a net weight of 327,102 pounds of damaged bones, the loss of which is figured at $5.70 per ton of 2,000 pounds. The damage was due to salt water, and the damage claim is based upon the averred unseaworthiness of the vessel.

The defense is a denial of any shortage in the cargo in fact, and this in turn is based upon a further denial of the correctness of the intake weights. The damage to the cargo is attributed to a hazard of the sea, the consequences of which are excepted by the charter party. The entrance of sea water is averred to have been due to the openings of the seams of the vessel following strains to which she was subjected in the tempestuous weather which she encountered. The bearing points of the controversy are thus seen to be two questions of fact. One is of the tonnage of the cargo, which in fact was put aboard the vessel. The other is whether the leaks were due to the condition of the vessel, or were due to heavy weather conditions, which would have caused a vessel of the stipulated seaworthiness to have sprung leaks to such an extent as to have caused the damage which was done. This latter fact question resolves itself into an inquiry into the character of the weather encountered on the voyage.

[1] The case for the plaintiff upon the first question consists wholly of the evidence of the quantity of bone taken on board which is supplied by the receipt given by the master of the vessel therefor. This evidence is not only prima facie, but may be characterized as strong prima facie, evidence. There are several persuasive reasons for so holding. One is what may be termed a reason of convenience, based upon the policy of the law to promote regularity and facilitate the transaction of business. Such evidence is further persuasive, because it is in the nature of a confessing admission, and such a paper has all the force of a self-disserving declaration by a party selfishly concerned not to make the admission unless the declaration speaks the truth. Moreover, the act of Congress, for the purpose of promoting the policy of the law spoken of, commands the courts to hold such documents to "be prima facie evidence of the receipt of merchandise therein described." There is no reason, and no command, however, to regard such evidence as other than strong prima facie evidence, resulting in putting upon the carrier the burden of proving the true state of the facts. The libelants in this case may in fairness be taken to have been

the weighmasters at the taking in and turning out ends of the voyage. If the master of the vessel delivers all the cargo which was taken on board, the only inference to be drawn from a discrepancy in the weights is that one or the other is incorrect. We make such fact finding in favor of the vessel. The testimony is direct and positive, and there is no reason to suspect that all the bones put on board this vessel were not delivered to the consignee. There is not even a suggestion or insinuation otherwise. The libel as to this part of its claim is in consequence dismissed.

[2] A like burden to prove exculpating facts is placed upon the vessel in its effort to relieve itself of the consequences of a portion of the cargo being damaged. The limitation of liability in the charter party is no broader than that incorporated in the act of Congress. The fact to be found in a case such as the instant one is an inference fact. Knowing the cargo, and the course and conditions of the voyage to be reasonably anticipated, is the damage which the cargo suffered one which would have been sustained, if the vessel had been up to the standard of seaworthiness, or is it one which would have resulted, notwithstanding the seaworthiness of the vessel? The respondent schooner is a wooden vessel. All wooden vessels leak, and the proper standard of seaworthiness is not affected by this fact. None the less, if such vessels are in proper condition, they will carry, and that without damage, cargoes such as that with which we are concerned on such a voyage as that which we are investigating. Heavy weather and seas subject sailing vessels to severe strains, which may result in their taking in water without this fact in any degree bearing testimony to their unseaworthiness. The springing of a leak, however, under some circumstances and other conditions of weather, might very strongly evidence and point directly to the conclusion of unseaworthiness. The facts in any particular case are to be found from all the evidence, and in this case the finding is in favor of the libelant, and against the respondent.

[3] The foregoing conclusions lead to a decree sustaining the libel as filed for the sum of $932.24, with an additional allowance for interest, and a further allowance to the libelant for its costs. The libelants having made an unsupported claim, might ordinarily be restricted to the claim of actual damages. The principle upon which such a ruling proceeds is not, however, applicable in the present case for two reasons. The libelants having a prima facie claim, which has been disallowed for the shortage were within their rights in asserting such claim, and as a defense was interposed to that part of their claim which has been allowed, all the expense of a trial hearing has been necessarily incurred. No evidence was introduced to show that the respondents offered the libelants any other redress for the loss of that to which they are found to be entitled or that they had other recourse than to that of filing and proceeding with their libel to a ruling thereon.

The foregoing discussion resolves itself into the finding of two facts: (1) There was no shortage in fact in the tonnage of the cargo as received and discharged by the vessel. (2) A part of the cargo as discharged was damaged, and this damage was done the cargo during the voyage and was due to the unseaworthiness of the vessel; she not be-

ing in the required and warranted condition of being staunch, tight, and seaworthy. The money measure of this damage is $932.24.

The earnestness with which the respective views of counsel were pressed at the argument calls for a further statement fortifying the conclusions already reached. A supporting authority to sustain the measure of the evidentiary value given to the bill of lading is found in the case of James v. Standard Oil (D. C.) 189 Fed. 719, appeal ruling 191 Fed. 827, 112 C. C. A. 341. It is true that the legal effect of the bill of lading being in evidence is to impose upon the master the burden of making satisfactorily clear the correct weight of the cargo taken aboard and discharged by the vessel. It is not, however, an accurate statement to aver, as was positively asserted at the argument, that "there was no evidence to contradict" either the bill of lading weights or the outturn weight figures. The evidence is clear and convincing that all of the cargo which was put aboard the vessel was received by the consignees. If this be the fact, it is persuasive of the existence of an error in one or the other of the stated weights, or of something occurring during the voyage affecting the weight of the cargo. It is frankly conceded that the cargo was not diminished through any human agency. It is admitted to be the fact that such a cargo under ordinary conditions will weigh less when discharged than when taken aboard. Such a discrepancy is looked for, but it would not be expected in a cargo of this size to exceed from 65,000 to 80,000 pounds, while the shortage as figured was substantially twice that. One of the experiences of the voyage affecting the weight of the cargo was that a part of the cargo was wet. The portion thus affected was in the outturn weight figured at 389,407 pounds. The weight of the water was likewise figured at 62,305 pounds. Deducting this added weight of water from the gross outturn weights gives a net outturn of 2,521,276 pounds, which deducted from the weight stated in the bill of lading of 2,670,345 pounds gives the estimated shortage of 149,069 pounds. It is thus seen that if the comparison is made between the gross outturn weights and the bill of lading weights, and allowance is made for the expected reduction in weight, the shortage entirely disappears.

It is argued, however, that it is entirely proper to allow for the added weight of water in the wet part of the cargo, because this weight is known to be there, and it is not proper to allow for the ordinary reduction in weight, because this reduction is due to the bones drying out, and that they did not in fact dry out under the conditions of this voyage, and because of this no lightening of weights should be assumed, and the discrepancy thereby becomes a real shortage. The significance of the fact that the cargo was undisturbed from the time it was shipped to the time it was discharged, it is further argued, is destroyed by the added fact that the vessel leaked, and because of this the fine bone and soluble constituents of the bone was dissolved and pumped out with the water through the scuppers. This brings to the front a rather nice distinction. The libel voices two grounds of complaint. The one is a shortage in delivery. The other is damage to the cargo through its becoming wet, owing to the unseaworthiness of the vessel. It is, of course, true that cargo taken aboard the

vessel and pumped overboard is as much cargo undelivered as if it had been pitched overboard or otherwise destroyed. At the same time the part of the cargo which had been dissolved by the action of the salt water and thus lost to the shipper would be included in any claim for damage made because of the cargo having become wet. It is therefore important to keep clear the distinction between a shortage in the cargo as such and a loss in bulk or weight of the cargo due to the damage from salt water, lest the two claims be permitted to overlap, and in this way there be a double allowance of the damage claim.

There only remains, therefore, to determine whether the shortage in weight is due in whole or in part to. the sifting of the fine bone in the undamaged part of the cargo into the wet portion, thereby reducing the otherwise undamaged part of the cargo both in bulk and weight, or whether the difference between the intake weights and outturn weights is due to inaccuracy in one or both. We have positive and convincing evidence of the correctness of the outturn weights. The intake weights, however, are known to us only through and by the bill of lading. This evidence, though acceptable as legal evidence, and though, as already stated, fully in legal effect prima facie justifying a finding of its accuracy, is nevertheless the kind of evidence whose force must yield to other evidence found to be persuasive of facts inconsistent with and contradictory of the accuracy of. the weights given in the bill of lading. If these weights were inaccurate, the discrepancy is accounted for, without troubling ourselves to find any other explanation of the shortage. Some light is thrown upon what is the real fact by the circumstance that a part of the bone was put in bags, and the bags were counted and the number stated. When the cargo was discharged, the bags were again counted, and there was found, not only the difference in weight already mentioned, but a difference in the count of the bags. There is a suggestion in the evidence, as bearing upon this discrepancy in the count, that some of the bags might have bursted, or in fact some of them did burst, and the contents get among the loose bone; but this evidence was neither sufficiently definite, nor did it point to a sufficient number of broken bags to account for the difference between the number stated in the bill of lading to have been taken aboard and the count of the number of bags discharged. It being an admitted fact in the case that all the cargo which was taken aboard had been kept under hatches, battened down and undisturbed until the cargo was discharged and the accuracy of the outturn weights and the outturn count of bags not being questioned, the conclusion cannot be escaped that the intake weights and count of bags as set forth in the bill of lading was inaccurate, and we have been unable to reach any conclusion of the extent to which it is inaccurate, other than that measured by the difference between the intake weights and the outturn weights, and the measure of the latter corrected by the analysis of the discharged cargo showing the extent to which the weight had been increased by the presence of water and decreased by the loss of the soluble constituents of the bone. Inasmuch as the latter, as already stated, has been

figured into the damage loss, it cannot again be allowed for as a delivery shortage. For this and other reasons we have reached the conclusion, already stated, that a finding of fact in favor of the respondent upon the shortage in delivery claim is the proper finding to be made.

Respecting the defense of hazards of the sea to the claim made for damages, there is occasion to add little to what is set forth in the finding already made. Such a defense carries with it essentially the thought of vis major. Seaworthiness, as fitness, is necessarily a relative term. So, likewise, are expressions descriptive of weather conditions and of sea. The respondent schooner, when she undertook this carriage, was a reclaimed wreck. This fact has a more or less important bearing upon the probabilities of the real cause of the damage to this cargo. We have not found in the evidence any suggestion even of the thought that, had this vessel been really seaworthy, she would nevertheless, under the stress of weather to which she was subjected, have taken in water to the extent to which she did take it in on this voyage. The only finding which the evidence justifies would be that of the two facts that she did encounter weather which might fairly be characterized as heavy and that she did leak so as to have at times five feet of water in her hold. The important fact is in the finding of whether she leaked not because of her unseaworthy condition, but because of the stress of weather and sea to which she was subjected, or, in other words, did she spring a leak in spite of the fact that she was seaworthy? Hazards of the sea may cause any vessel to spring a leak, but vessels sometimes are in a condition in which they will leak, and, of course, they will leak under conditions of strain due to heavy weather. The difference is to some extent expressed between the two phrases, one that a leaky vessel encountered heavy weather, and the other that a vessel sprang a leak during and because of the heavy weather which she encountered.

The decree to be entered in accordance with the findings made is sufficiently indicated, and a formal decree embodying the findings herein made may be submitted.