## THE JOHN TWOHY.

### CUMMINS et al. v. T. M. DUCHE & SONS, Limited.

(Circuit Court of Appeals, Third Circuit. March 1, 1922.)

No. 2401.

1. **Shipping ⬥42—Charter carries implied warranty of seaworthiness.**
   A charter carries an implied warranty of seaworthiness, unless limited by the terms of the charter party.

2. **Shipping ⬥132(3,4)—Burden of proof on shipowner to prove seaworthiness and that loss was by perils of the sea.**
   In a suit for damage to cargo, the burden rests on the shipowner to prove seaworthiness of the vessel at the beginning of the voyage and also to sustain the defense that the damage was caused by perils of the sea, within the exception of the charter party or bill of lading.

3. **Shipping ⬥132(4)—Excessive leaking of ship warrants inference of unseaworthiness.**
   Where damage to cargo was caused by excessive leaking of the ship, evidence that she did not encounter unusual weather conditions, in the absence of other explanation, warrants the inference that she was unseaworthy at the beginning of the voyage.

4. **Shipping ⬥132(3,5)—Bill of lading prima facie evidence of quantity received.**
   A bill of lading is prima facie, but not conclusive, evidence of the quantity received and in a suit for short delivery the burden rests on the ship to satisfy the court that she delivered all that was received.

5. **Shipping ⬥132(5)—Ship held liable for short delivery of cargo.**
   Evidence *held* insufficient to show incorrectness of a bill of lading as to quantity, set up as a defense to a suit for short delivery.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in admiralty by T. M. Duche & Sons, Limited, against the schooner John Twohy; Albert D. Cummins and Howard Compton, claimants. Both parties appeal, the claimants being designated appellants. Affirmed in part, and reversed in part.

For opinion below, see 243 Fed. 720. See, also, 255 U. S. 77, 41 Sup. Ct. 251, 65 L. Ed. 511.

Howard M. Long, of Philadelphia, Pa., for appellants.

Harrington, Bigham & Englar, of New York City, and Conlen, Brinton & Acker, of Philadelphia, Pa. (J. Thurston Manning, Jr., and William J. Conlen, both of Philadelphia, Pa., of counsel), for appellee.

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This is an appeal in admiralty. As the case stands, really two appeals are involved: One by the schooner from the part of the decree allowing the charterer damages for injury to the cargo; the other by the charterer—the case being on trial de novo—from the part of the decree denying it damages for short delivery. The John Twohy, 255 U. S. 77, 41 Sup. Ct. 251, 65 L. Ed. 511.

The John Twohy was a reclaimed wreck, purchased by the claimants, repaired at a cost of $22,000 and given a classification of A–1½ by the American Lloyds. While in the Delaware River she was chartered to the libellant, with a warranty of seaworthiness, to carry a cargo of bones from Buenos Aires to Philadelphia. On her outward voyage she leaked, but whether more than ordinary for a wooden schooner could not be proved because of the disappearance of her log. Having taken on the cargo at Buenos Aires, the schooner, homeward bound, encountered heavy weather, but no more than usual in those waters at that season. She began to leak, and to leak badly, without known cause, gaining an average of six inches an hour and having in her hold at times as much as five feet of water. The pumps were worked almost continuously. After sixty-three days, with hatches battened down all the while, she made the port of Philadelphia. The charterer, discovering the condition of the cargo when being discharged, filed this libel, claiming damages against the schooner for injury to her cargo and for short delivery. The District Court found for the libellant on the first ground and for the schooner on the second. The John Twohy (D. C.) 243 Fed. 720.

[1-3] The libellant's first claim is for damages to the cargo. The schooner's liability arises from her warranty of seaworthiness, The Edwin J. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688, under the obligation of shipowners to provide a seaworthy vessel unless by the terms of the charter-party they limit their obligation to the exercise of due care to make her so. The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794. There was nothing in the charter-party limiting this obligation. Therefore the burden of affirmatively proving her seaworthiness at the commencement of the voyage, as well as sustaining the defense that the damage to the cargo was due to perils of the sea within exceptions of the charty-party and bill-of-lading, rests upon the owners. International Navigation Co. v. Farr & Bailey Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830; The Wildcroft, supra. We find the owners have not sustained this burden. Atlas Portland Cement Co. v. P. Dougherty Co., 205 Fed. 508, 123 C. C. A. 576; The Erskine M. Phelps (D. C.) 231 Fed. 767. There was nothing unusual about the voyage except the extent the schooner leaked. While at times the weather was heavy it was not out of the ordinary and the schooner encountered no mishaps. She simply leaked in a measure beyond the seaworthiness of a wooden schooner. We are compelled to draw the inference, in the absence of anything which explains her leaking condition at sea, that she was unseaworthy before setting sail. The River Meander (D. C.) 209 Fed. 931; Compagnie Maritime Francaise v.

Meyer, 248 Fed. 881, 160 C. C. A. 639; The Warren Adams, 74 Fed. 413, 20 C. C. A. 486. Therefore, we think the court was right in holding the schooner liable on the warranty.

Turning to the amount of damages, it appears that the injury to the wet bones was based on two factors, changed chemical condition and changed physical condition. Change in the chemical condition of the bones was based on analyses showing loss of the ingredients of ammonia and phosphoric acid (both more or less soluble in water) by comparison with the ammonia and phosphoric acid content of dry bones of the same character. The loss was represented to be three-fourths of one per cent. of ammonia and six and one-half per cent. of phosphoric acid. These two ingredients constitute plant food for which alone bones are bought and used in the manufacture of fertilizers. The wet bones were undesirable because of the dirty, slimy and generally nasty condition into which they were brought by lying in salt water. This change in physical condition did not detract from their chemical value as ingredients in fertilizers. It only made them a little more difficult to work into fertilizers with a presentable appearance. On this evidence the libellant claimed and the court allowed damages on 327,102 pounds of bones at $5.70 per 2,000 pounds, or $932.24. We think damages in this amount were proved and therefore affirm the part of the decree holding the schooner liable for injury to the cargo.

[4] The libellant's second claim is for damages for short delivery of cargo. This claim is more involved. The libellant proved by the bill-of-lading that the intake weight of the cargo of bones was 2,670,345 pounds and the out-turn weight was 2,583,581 pounds. Of the latter, however, 389,407 pounds were wet. Excess moisture in 389,407 pounds of bones was established at sixteen per cent. or in weight at 62,305 pounds, which on deduction from the gross out-turn weight left a net out-turn weight of 2,521,276 pounds of dry bones, or a shortage between intake and out-turn of 149,069 pounds. On this short delivery, calculated at $27 per 2,000 pounds less freight at $6 per 2,240 pounds, the libellant makes a claim for $1,612.26.

On loading, the cargo was weighed by the consignor but the weight was given in the bill-of-lading signed by the master of the schooner. This weight is not directly disputed by anyone as a matter of fact. It is disputed as a matter of inference only because the out-turn weight was less and there is no perfectly certain way of accounting for the disappearance of the difference.

As to the schooner's liability for the delivery of less cargo than her master admitted she had received, we start with the bill-of-lading. A bill-of-lading, when acknowledging the receipt of goods without more, is regarded generally as strong prima facie evidence of the correctness of the quantity stated. The Lady Franklin, 8 Wall. 328, 19 L. Ed. 455; The Presque Isle (D. C.) 140 Fed. 202. Its probative force is given by Judge Ward in James v. Standard Oil Co., 191 Fed. 827, 112 C. C. A. 341, affirming (D. C.) 189 Fed. 719, as follows:

"The bill-of-lading in respect to the quantity received is a receipt, and, though entitled to great weight as an admission by the ship, it is not conclusive. *The burden lies upon the ship of thoroughly satisfying the court* that

she actually has delivered all the cargo she has received *and that the bill-of-lading is erroneous*."

[5] Until the schooner has met this burden, the bill-of-lading must stand. The only way in which the schooner has attacked the correctness of her bill-of-lading weight is by maintaining, and proving, that there is a natural shrinkage in bones, and by relying on the fact that she had less bones when she arrived in Philadelphia than she thought she had when she left Buenos Aires.

There is a natural shrinkage in bones of from one to two per cent. but only when bones are dry. The under-stratum of this cargo was wet; indeed, it was saturated. On it lay an upper-stratum of dry bones. Both were in the hold of the schooner with hatches closely battened down for more than two months. Considering the spongelike structure of bones it is certain that in the wet condition of the hold the shrinkage of relatively dry bones, if any, was negligible. With shrinkage out of the way, we are back to the bill-of-lading which the schooner says (and the court found) showed incorrect intake figures; or if correct, we are asked to find that the out-turn figures must be incorrect, on the claim that the evidence shows that all of the cargo which was put aboard the schooner was delivered to the consignees. These contentions, made by the schooner in the alternative, are based on the hypothesis that from the nature of things one set of figures must be incorrect. It is admitted that no one purposely or consciously made away with the bones. Yet there is a difference of 149,069 pounds between the intake and out-turn figures, which, prima facie, represents the disappearance of that quantity of bones in transit. All this is a mystery, yet it is one which the libellant offers to solve by the assertion—at first startling—that the bones had been pumped overboard. That some part of the cargo of bones was pumped overboard is the inescapable logic of the award of damages for injury to the cargo. If the part of the decree, now affirmed, allowing the libellant damages for injury to the cargo through loss of ammonia and phosphoric acid is sound, the decision establishes conclusively that at least this part of the cargo was pumped overboard.

Whether the remainder of the shortage disappeared in the same way is not so easy to determine.

The bones in the hold were stored in bulk. They were not ground; they were crushed, running in size from that of a grain of corn to the grains of corn meal. Further, their particles were more or less ground or pulverized by abrasion so that some of the cargo was very fine. The libellant contends that the fine bone seeped through the seams of the ceiling with the water when it was sucked out by the pumps. If the seams were sufficiently open to admit six inches of water an hour, or as much as five feet of water at a time, it is altogether possible that they were wide enough to permit the water, as it receded, to carry small particles of bone with it. It is likewise probable that the quantity of bones thus carried off by constant pumping for nearly two months was considerable. Against the certain disappearance of many thousand pounds of soluble ammonia and phosphoric acid through the pumps, and in addition the certain disappearance of bones in some

amount in the same way, we have not found that either the intake weight or the out-turn weight must of necessity be incorrect, but on the contrary we have been forced to find that there was a short delivery showing clearly that the intake weight was greater than the weight of the cargo delivered. On the finding of this fact the burden of the schooner to establish the incorrectness of the figures of the bill-of-lading becomes heavier. That burden the schooner has not sustained. Therefore, we are constrained to reverse the part of the decree which denied the libellant's claim for damages for short delivery and to direct that the decree be reformed allowing damages—but not in the precise amount claimed, for this reason:

The libellant calculated its claim for short delivery as follows: It took the "wet and damaged bones" at a weight of 389,407 pounds and, on the principle of extracting the water, subtracted from it 62,305 pounds for moisture, making a net weight of dry damaged bones of 327,102 pounds. On this weight it claimed and, as before stated, was awarded by the decree damages at $5.70 per 2,000 pounds, or $932.24. This is an important starting point on the second claim because in the damages awarded on the first claim there was involved the element of *weight*. On weight depends the question of short delivery.

Returning to the first claim for a moment, it is clear that damages were allowed because of injury to the bones as an ingredient of fertilizers. The value of bones as an ingredient of fertilizers is in the plant food they contain. This plant food is in the form of ammonia and phosphoric acid. While bones contain other chemicals, these are the only two on which the price is calculated. All else is inconsequential and is not figured in the price. So the damage to the wet bones by the loss of their ammonia and phosphoric acid content, produced a deficiency, it was testified, of $3/4\%$ of ammonia and $6\frac{1}{2}\%$ in phosphoric acid. In other words, $3/4\%$ of ammonia and $6\frac{1}{2}\%$ of phosphoric·acid had been washed out of them. These percentages are on weight. It follows, therefore, that the libellant has been awarded full damages for the loss of this weight of bones occasioned by their ammonia and phosphoric acid content, soluble in water, having been washed away. This loss of ammonia and phosphoric acid based on the analyses is given in evidence as 23,795 pounds. Having been allowed damages for loss from the bones of this number of pounds of ammonia and phosphoric acid, the libellant cannot again be awarded damages for short delivery of these same pounds. We are of opinion, however, that the libellant is entitled to recover for the short delivery of 149,069 pounds less 23,795 pounds of ammonia and phosphoric acid already included in damages allowed for injury to cargo; or, put into figures, the libellant should be allowed for short delivery the difference between 149,069 pounds and 23,795 pounds, or 125,274 pounds at $27 per 2,000 pounds, amounting to $1,691.20, less freight thereon at $6 per 2,240 pounds, amounting to $335.55, leaving a net balance due the libellant of $1,355.65 with interest.

The decree of the District Court is affirmed in part and reversed in part and the case is remanded for modification of the decree in conformity with this opinion, four-fifths of the costs of this appeal to be borne by the appellants and one-fifth by the appellee.