BENNER LINE v. PENDLETON et al.

(District Court, S. D. New York. November 14, 1913.)

No. 486.

**1. SHIPPING (§ 204*)—LOSS OF CARGO—LIABILITY OF PART. OWNER OF VESSEL.**

A suit may be maintained against a part owner of a vessel for loss of cargo for which the vessel would be liable, but his liability is limited by Act June 26, 1884, c. 121, § 18, 23 Stat. 57 (U. S. Comp. St. 1901, p. 2945), to the proportion of the loss that his individual share of the vessel bears to the whole.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 639, 640; Dec. Dig. § 204.*]

**2. SHIPPING (§ 132*)—SUIT FOR LOSS OF CARGO—PARTIES.**

Libelant advertised to transport merchandise from New York to Porto Rico, and when sufficient contracts for shipments had been obtained chartered a vessel and notified the shippers to deliver their merchandise to the vessel, and bills of lading were issued direct to them. A vessel so chartered was lost, and the insurance companies paid the loss to cargo owners. *Held*, that libelant had the right as bailee of the owners of the cargo to maintain a suit for such loss against the owners of the vessel, and, having such right, it could maintain the suit in behalf of the insurers as successors to the rights of the insured by subrogation.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*]

**3. SHIPPING (§ 132*)—LOSS OF CARGO—SEAWORTHINESS OF VESSEL.**

Where a ship three days after starting on a voyage, in weather which, although heavy, was not extraordinary, sprang a leak of so serious a character that she was afterward abandoned and became a total loss with her cargo, and where three of her four pumps when put in use almost immediately broke down and became useless without any adequate reason shown, the inference is warranted that she was unseaworthy when she commenced the voyage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*]

**4. SHIPPING (§ 121*)—LIABILITY FOR LOSS OF CARGO—SEAWORTHINESS.**

The obligation on the owners of a ship according to the maritime law is that she must be in fact seaworthy at the commencement of the voyage, and it is immaterial that the owners believe her to be seaworthy or have used every reasonable effort to make her so.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 449–451, 466; Dec. Dig. § 121.*]

**5. SHIPPING (§ 137*)—LIABILITY FOR LOSS OF CARGO—HARTER ACT.**

Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), which provides that if the owner of a vessel shall exercise due diligence to make her in all respects seaworthy, etc., he shall not be liable for damage or loss to cargo resulting from faults or errors in navigation or in the management of the vessel, does not exempt him from liability for loss resulting from her unseaworthiness.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 137.*]

**6. SHIPPING (§ 205*)—LOSS OF CARGO—LIMITATION OF LIABILITY.**

A charter of a particular vessel by the owner binds the vessel and is not the personal contract of the owner in such sense as to preclude him from limitation of his liability for loss of cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 641, 642; Dec. Dig. § 205.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by the Benner Line against Fields S. Pendleton and Edwin S. Pendleton, copartners under the firm name of Pendleton Bros., and Fields S. Pendleton individually. Decree for libelant against Fields S. Pendleton.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for libelant.

Henry W. Goodrich, of New York City, and William H. Gulliver, of Portland, Me., for respondents.

HOLT, District Judge. This action is brought to recover damages for the loss of a portion of the cargo of the schooner Edith Olcott, which was lost at sea on August 7, 1910. The libelant, the Benner Line, is a corporation engaged in the business of transporting merchandise between New York and Porto Rico and other southern ports. The respondents Fields S. Pendleton and Edwin S. Pendleton were copartners, doing business under the name of Pendleton Bros. Fields S. Pendelton owned nine-sixteenths of the Edith Olcott. Edwin S. Pendleton owned no interest in the ship. The firm of Pendleton Bros. acted as agents for the owners, and as such signed a charter party, chartering the Edith Olcott to the libelant for a round voyage from New York to Porto Rico and return, for the lump sum of $3,500. The charter provided that "the said vessel shall be tight, staunch, strong and in every way fitted" for the voyage in question. The schooner, on Sunday, July 31st, left New York for Porto Rico. All went well until the following Wednesday, when it was discovered that there was about four feet of water in the hold. The amount of water continued to gradually increase until Saturday of that week, when the amount of water in the hold was about 13 feet, and the ship was obviously in danger of sinking. A signal of distress was put up. The steamer King Edgar came to their relief, took the Olcott in tow, and attempted to tow her to New York, but, after some hours of towing, the cable broke, and thereupon the crew was taken off and brought to New York and the Olcott abandoned. She thus, with her cargo, became a total loss.

[1] The respondent Edwin S. Pendleton owned no interest in the schooner, and appears to have been sued simply because he was a member of the firm which as agents for the owners signed the charter party. I do not see any ground therefore upon which a suit can be maintained against him, and the libelant's counsel concedes in the brief filed that the libel as to him should be dismissed. I think that this suit may be maintained against the respondent Fields S. Pendleton, who was the owner of nine-sixteenths of the Edith Olcott, but that his individual liability under the act of 1884 amending the limited liability statutes is limited to the proportion of the claims sued on that his individual share of the vessel bears to the whole; that is, he is liable for nine-sixteenths of the libelant's claims provided the libelant's right to recover generally is established and the defenses interposed are not maintained.

[2] The respondent claims that the libelant cannot maintain this action on the ground that, bills of lading having been issued directly

to the shippers, the charterer cannot maintain the action. The method of doing business by the Benner Line was this: The Benner Line advertised to transport merchandise to Porto Rico, and made contracts with shippers to that effect. When a sufficient amount of cargo had been contracted for, the Benner Line chartered a vessel, and directed the shippers to deliver their merchandise to the vessel. The shippers thereupon sent their merchandise to the vessel, and received shipping receipts, which were subsequently exchanged for bills of lading. These bills of lading undoubtedly bound the ship. But the essential nature of the arrangement was that the shippers contracted with the Benner Line in the first instance. They did not select the vessel on which their goods were to be shipped. They sent their merchandise to whatever vessel the Benner Line directed them to send it. The vessel having been lost, the various insurance companies paid the various claims of cargo owners, and this suit is brought by the Benner Line nominally as bailee of the shippers, but actually in behalf of the insurance companies. Under the well-settled practice in admiralty, the carrier could have sued as bailee for the shippers. The Beaconsfield, 158 U. S. 303, 15 Sup. Ct. 860, 39 L. Ed. 993; The New York (D. C.) 93 Fed. 495. If the carrier could sue as representing the shippers, I think it could sue as representing the insurance companies, which, by virtue of their payment of the claims of the shippers, were subrogated to the rights of the shippers.

[3] The respondent also claims that the schooner was seaworthy when she sailed, and that therefore he is not liable for her loss. The charter party contained an express warranty of seaworthiness, which, indeed, would have been implied if no such warranty had been contained in the charter party. The evidence shows that when the Edith Olcott was about four days out from New York she sprang a leak so serious that between the previous evening, when the usual soundings showed no water in her, and the succeeding morning about 8 o'clock, four feet of water had entered the hold. This amount steadily increased during the following three or four days, although one large and one small steam pump were constantly at work, until there was about thirteen feet of water in the hold, and the vessel had to be abandoned in a sinking condition. The only explanation suggested as the cause of this leak is either that the vessel struck some submerged object or that the weather was so heavy as to cause the ship to leak. Wright, one of the officers, when examined nearly three years after the accident, testified, in substance, that about midnight of the night before the leak was discovered he felt a slight shock, and that he spoke of it to the mate, but did not really think at the time that anything had happened. No one else on the ship felt anything. No reference is made to this alleged shock in the protest which was made immediately after the crew reached New York. No reference is contained in the answer to any such occurrence, but the answer alleges that the schooner "encountered perils of the sea, among other things, a very heavy wind and heavy sea, so that said vessel labored heavily, and such conditions continued until the morning of the 5th day of said August, during which time said schooner became greatly strained, causing her to

leak." Indeed, there is no evidence that any claim was made by anybody that the leak was caused by striking a submerged object until Wright testified in May, 1913.

That a vessel at sea may be struck by some submerged object, causing a sudden leak, is of course possible, but not very probable. That a sufficiently serious blow to have caused such a leak should have occurred in such a manner as to have attracted the attention of one person on the ship without attracting the attention of any other seems to me also improbable. The fact that apparently no one upon the ship except Wright heard of such an occurrence at the time is very suggestive. Here was a ship with a crew of nine men, suddenly springing a dangerous leak. For several days, during which the lives of the crew were in imminent danger, every effort was made to overcome it, without success. The ship was finally abandoned in a sinking condition, and the crew brought to New York. Every detail and circumstance of such an event would naturally have been talked over by every one on board, and would have been remembered when the story was told at New York. The facts that only one man claims to have felt this alleged shock, that at the time he did not think it amounted to anything, and that there was no reference made to it in the protest or in the answer or in any account given of the occurrence at the time, makes it, in my opinion, impossible for the court to give any weight to the claim that this leak was caused in that way. All that can be said is that it was possible; but in such a case the burden is upon the shipowner to show by satisfactory proof how such a leak occurred. The only other explanation of the leak is that given in the answer, that the schooner was subjected to such heavy weather that the straining of the ship caused the leak. But admittedly the weather was not heavy until the night before the leak, and, although from that time until the ship was abandoned there was heavy weather, there was nothing so extraordinary about it that a ship in a proper condition to make an ocean voyage should not have been in condition to undergo the strain. The respondent has given elaborate evidence to the effect that the ship was kept in very good condition; that she had been carefully inspected, overhauled, and put in order before the voyage; and that she had a rating with the insurance companies as high as is ever given any vessel of her age. I have no doubt that her owners believed her to be seaworthy. But facts in such a case speak louder than words, and the facts that she sprang so bad a leak on the first night of heavy weather that occurred upon her voyage, and that there is no adequate explanation given of it, is, in my opinion, not consistent with her being seaworthy at the beginning of the voyage.

But a more serious claim of unseaworthiness is based on the action of her pumps. The schooner had on board five pumps, a steam pump called the "wrecking pump," another steam pump called the "messenger pump," a small steam pump called the "circulating pump," all forward, and two hand pumps aft, one on the port side and one on the starboard side. These pumps, according to the evidence of the respondent, had been actually used on the previous voyage and were carefully tried immediately before sailing, and all worked satisfactorily

and efficiently. As soon as this leak began, the wrecking pump was started, and almost immediately broke down. This pump was run by a cogwheel, and almost as soon as it was started several of the cogs broke, so that it is claimed that. the wheel would not engage the corresponding cogs, and that therefore the pump would not operate. No explanation is given why these cogs broke, or what was the appearance of the broken part. No attempt was made apparently to repair the broken part, or to substitute some other method. of operating the pump. At all events, the use of that pump was thereupon abandoned and never resumed. The messenger pump and the small circulating pump were then started, and apparently worked well during the entire period between the discovery of the leak and the abandonment of the ship, but did not discharge a sufficient amount to keep the water in the hold from steadily increasing. Immediately after the wrecking pump failed, the men started to use the hand pumps aft, both of which the evidence shows. were in perfect order and pumped satisfactorily immediately before the voyage began. They began to work with the port hand pump, which very soon after they commenced pumping failed to operate. No explanation is given why it failed to operate. The captain says that perhaps the packing was too tight, but if that was the explanation there is no evidence of any effort to remedy the packing. At all events, the use of the port pump was thereupon abandoned, and it was not used or tried afterwards. They then tried to pump with the starboard hand pump, and after a short time that ceased to act. The captain says that he suspected that there was some obstruction at the bottom of the pipe, and gave orders to have the pipe taken out. A tackle was rigged over it, and the pipe was pulled out up through the deck. This appears to have been a work of considerable difficulty. They were several hours in accomplishing it. The captain testified that the pipe was dented and bent in the operation of pulling it out, so that it could not be put back, and it thereupon was lashed on deck and remained lashed and unused thereafter. There is no explanation why it was so difficult to pull it out, or why it should have become jammed and bent and made useless by the operation of pulling it out. Especially there is no evidence that anything was found after it was pulled out that caused the obstruction which led to its being pulled out. No attempt seems to have been made to restore it to its original condition and to resume its use.

It is suggested that the hold was so deep that these hand pumps worked hard. But the evidence is that they worked well before this voyage, and as the water in the hold continually increased the distance through which the water had to be raised continually decreased. In view of all the circumstances in the case, if a single accident to a single pump had occurred, it might be reasonable. to attribute it to a mischance; but here were three powerful pumps proved to have been in perfect order before the vessel sailed, each one of which broke down immediately as soon as an attempt was made to use it, and no adequate explanation is given why they immediately broke down. I give no weight to the evidence of those members of the crew who testified that the pipe which was taken out was rusted and full of holes. The mem-

bers of the crew who refused to sign the protest and who have testified against the ship were obviously a venal and dishonest lot. They were constantly offering their testimony for sale to the respondents, and I have no doubt that if their price had been paid they would have signed the protest and afterwards testified in the respondents' favor. I reject their evidence entirely. But the fact remains, in passing upon the question of the seaworthiness of this vessel, that three different pumps which it had provided to meet just such an occasion as arose in this case broke down immediately one after the other, and that there is no adequate explanation given why they broke down. The evidence tends to show that if either of these pumps which failed had worked to its full capacity the water could have been kept down and the vessel probably saved. In my opinion, under these circumstances, the inference is irresistible that the pumps which failed were not fit to use when the ship started, and that therefore the ship was not seaworthy at the beginning of the voyage. I have no doubt that the owners believed her to be seaworthy, and that Capt. Fletcher, a very competent man, to whom the owners had intrusted the duty of putting the ship in order, believed her to be seaworthy.

[4] But the obligation upon the owners of a ship, according to the maritime law, is that a ship must be in fact seaworthy at the commencement of the voyage, and it is entirely immaterial whether the owners believe her to be seaworthy or have used every reasonable effort to make her seaworthy. If she was not in fact seaworthy when the voyage began, the owners are liable under the general rules of the maritime law unless such liability is limited by the statutes limiting the liability of shipowners.

[5] I think that the Harter Act has no application to this case. That act provides, in substance, that if a shipowner shall exercise due diligence to make the vessel seaworthy, he shall not be held responsible for damage or loss arising from faults in the navigation of the vessel or from dangers of the sea. But there is nothing in the evidence to indicate that the Edith Olcott foundered because of any fault in navigation or from dangers of the sea, within the meaning of that expression in maritime law. She foundered, in my opinion, because she was not seaworthy. But the Harter Act does not undertake to impose any new liability on vessel owners for sending an unseaworthy ship to sea. That liability, as I understand the act, is left to be governed by the general rules of the maritime law.

[6] The respondent alleges as a defense to this suit that he is exempted from liability, except to the extent of the value of the ship and the pending freight, by the statutes limiting the liability of shipowners. The libelant claims that the respondent cannot avail himself of that statute because of the authorities which hold that the statutes exempting a shipowner from liability are not a defense to a claim based upon the personal contracts of the shipowner. The charter party in this case was signed by Pendleton Bros., and the libelants' counsel claims that therefore the charter party was the personal contract of the defendant Fields S. Pendleton and his partner. But the cases holding that a shipowner is not entitled, by virtue of the statutes limiting his

liability, to exemption from liability on his personal contracts, apply, as I understand it, to contracts which are strictly personal, and do not in terms bind the ship. For instance, in the case of The Loyal (D. C.) 198 Fed. 591, affirmed 204 Fed. 930, 123 C. C. A. 252, relied on by the libelant, the Jarvis Company, the owner of the Loyal, entered into a contract with the Apollinaris Company to lighter in and about the harbor of New York consignments of mineral waters to be received at New York by the Apollinaris Company. The contract did not specify any particular vessel by which the lightering was to be done. It would be complied with if the Jarvis Company provided any vessel to do the lightering, and it was immaterial to the Apollinaris Company what vessel was provided. It was therefore the strictly personal contract of the Jarvis Company, which imposed no obligation upon any particular vessel, and for liability under which the Jarvis Company could not exempt itself from responsibility by the surrender of any particular vessel. So in the case of the Great Lakes Towing Co. v. Mill Transp. Co., 155 Fed. 11, 83 C. C. A. 607, 22 L. R. A. (N. S.) 769, there was a general contract for towing entered into by the Great Lakes Towing Company. It was not a contract providing for towing by any particular vessel. In the other cases cited in which vessel owners have been denied the right to obtain exemption from liability upon contracts under statutes limiting the liability of shipowners, the contracts have been strictly personal contracts by which the personal credit of the shipowners was pledged. Rudolf v. Brown (D. C.) 137 Fed. 106; Gokey v. Fort (D. C.) 44 Fed. 364.

But in the case at bar the charter party signed by Pendleton Bros. was a charter party of the particular schooner Edith Olcott. Pendleton Bros., in signing that charter party, acted as the agents of the owners. The agreement was the owners' agreement chartering the schooner, and was an agreement made in the conduct of the business of the schooner. Under such circumstances, in my opinion, the charter party cannot be regarded as the mere personal contract of Pendleton Bros. It was the ordinary case of a charter party binding the vessel. In my opinion, the schooner was not seaworthy at the beginning of the voyage, but such unseaworthiness was without the privity or knowledge of the owner. The respondent therefore in my opinion is entitled to exemption from liability. The ship was a total loss. The evidence is not clear whether there is any pending freight to be surrendered. The evidence shows that most of the freight due from the shippers to the charterer was prepaid, but there were several consignments on which the freight was not prepaid. It does not appear whether the lump sum of $3,500 has been paid by the charterer to the owners.

My conclusion therefore is that the libelant is entitled to recover the amount of its damages, so far as any pending freight is applicable to pay such damages, as provided for by the statutes limiting the liability of shipowners, but that the respondent is not liable to any greater extent. I regret to be obliged to reach such a conclusion, which I think unjust, but that, in my opinion, is not infrequently the result of the operation of the statutes limiting the liability of shipowners when the ship itself is a total loss.

A reference should be ordered, unless counsel can agree on the facts, to take testimony and report whether there is any freight pending to be surrendered, within the meaning of the statutes exempting ship-owners from liability, and if so, how much, and whether the libelant is entitled to a judgment for the whole of said amount or for only nine-sixteenths of said amount, with authority in his discretion to take testimony, and report on any other question which may appear to be necessary to a proper determination of the amount to be recovered in the suit.