## THE HEDDERNHEIM.

### KORSNAS SAGVERKS AKTIEBOLAG et al. v. UNTERWESER REEDEREI AKTIENGESELLSCHAFT.

### PERKINS–GOODWIN & CO. et al. v. SAME.

### UNTERWESER REEDEREI AKTIENGESELLSCHAFT v. PERKINS–GOODWIN & CO. et al.

District Court, S. D. New York.
April 22, 1941.

Forrest E. Single, of New York City, for Korsnas Sagverks Aktiebolag.

Hill, Rivkins & Middleton, of New York City (Gregory S. Rivkins and Eugene P. McCue, both of New York City, of counsel), for Gottesman & Co., Inc.

Hatch & Wolfe, of New York City (Carver Wolfe and Rolf Michelsen, both of New York City of counsel), for Perkins-Goodwin & Co.

Haight, Griffin, Deming & Gardner, of New York City (Wharton Poor and James McKown, Jr., both of New York City, of counsel), for Unterweser Reederei Aktiengesellschaft.

CONGER, District Judge.

These are six libels which were tried together. The cargo owners are suing for damages for (1) the cargo which became wet as a result of stranding, and which was sold at Sundsvall, Sweden; (2) the cargo which was found damaged by fuel oil and sold at Kiel, Germany; and (3) the cargo which was damaged in respect to the covers of the bales, as a result of discharge and reloading at various ports. The shipowners have alleged causes of action for general average against the cargo owners, and against the guarantors of the general average.

The SS Heddernheim, of 4,946 tons, built in 1921, was loaded with a full cargo of woodpulp at several ports in Sweden, and, on January 4, 1933, set sail from Wifstavarf, Sweden, for various ports on the Eastern Coast of the United States.

She left the Swedish port with a government pilot on board, and about an hour and a quarter later, as she was passing Draghallen lighthouse, she struck a rock, and began to make considerable water in her No. 1 hold. The vessel put about and returned to Sundsvall, Sweden, under her own power, where she was beached on a clay bank to prevent her sinking. Soundings were made which showed twenty feet of water in No. 1 hold; the ship's pumps were kept going but were unable to control the inflow of water.

She was examined by three surveyors appointed by the Magistrate's Court of Sundsvall; by the harbor master; and by one Sachse, marine superintendent of the owners, and various temporary repairs were ordered after a diver had been sent down to ascertain the damage to the ship's bottom. The temporary repairs, which consisted of quick-drying cement being poured into her bilges, were made, and a certificate of seaworthiness was issued by the surveyors, after which the Heddernheim set sail again for the United States on January 14, 1933.

As a part of her cargo in the No. 1 hold was damaged by seawater after the stranding, that part of the cargo had to be discharged and sold at Sundsvall.

When the ship rounded the southern extremity of Sweden a few days later, it was noticed that No. 2 hold was filling with water. Although the water in the hold was controlled by the pumps, the master decided it would be unsafe to cross the North Atlantic, and stopped at Helsingor, Sweden, where he telephoned the owners that he was proceeding to Kiel, Germany, where the vessel arrived on January 18, 1933, to be repaired.

At Kiel, the Heddernheim was drydocked and all her cargo was discharged. The ship had twenty-four plates on her bottom renewed or replaced, as well as other general repairs, and on February 18, 1933, she sailed once again for Portland, Maine, her first port of designation in the United States.

On February 20, 1933, while at sea, it was found that the Heddernheim was consuming an excessive and unusual amount of feed water in her boilers. Upon an examination it was found that the tubes of the starboard boiler were leaking considerably. The boiler was shut off, and the center boiler, which had not been used previously on the voyage, was lit. The port boiler was also found to be leaking, although its temporary use could be, and was, continued. The furnaces of both boilers, upon inspection, were found to be dented and buckled. In view of this condition of her boilers, the master decided the Heddernheim would have to put into a port of refuge, and accordingly, on February 23, 1933, she arrived at Leith, Scotland, as an emergency port, where four defective furnaces were replaced with new ones. No cargo was discharged at Leith.

On March 22, 1933, the Heddernheim once again sailed for the United States,

and without further trouble, discharged her cargo at the designated ports in the United States.

The within suits present a number of questions, which may be outlined as follows:

(1) Was the Heddernheim seaworthy on sailing from her original port of Wifstavarf in respect to her boilers and condensers?

(2) If she was not seaworthy, was due diligence exercised on the part of her owners to make the Heddernheim in all respects seaworthy on sailing from Wifstavarf, in order to come within the provisions of the exemptions of the Harter Act, 46 U.S.C.A. § 190 et seq., and the "Jason" clause of the bills of lading?

(3) If due diligence was not exercised in (2) above, do the proofs establish negligence in navigation on the stranding off Draghallen light?

(4) If due diligence was exercised as to her boilers, and/or if the ship was seaworthy as to her boilers, was the Heddernheim unseaworthy on sailing from Wifstavarf because the master used a German chart of a smaller scale than a Swedish chart?

(5) If due diligence was exercised to make the Heddernheim in all respects seaworthy, and independent of the stranding at Draghallen lighthouse, was the ship seaworthy on her sailing from Sundsvall after the repairs were made?

(6) If the Heddernheim was unseaworthy on her sailing from Sundsvall, was due diligence exercised on the part of her owners to make her seaworthy before sailing from Sundsvall?

(7) If the ship was seaworthy, and/or due diligence was exercised to make her in all respects seaworthy, are the cargo owners liable for general average on the return to Sundsvall? On the return to Kiel? On the putting into Leith?

(8) If due diligence was not exercised to make the Heddernheim in all respects seaworthy, are the cargo owners liable for general average?

The prima facie cases of the cargo libelants have been stipulated, and the trial before this court was an effort on the part of the steamship owners to adequately explain the various events of the voyage giving rise to the damages, and to show that due diligence was exercised on the part of the owners to make the ship seaworthy in all respects so as to come within the exemption of the Harter Act. 46 U.S.C.A. § 192.

It might be well to point out that before a carrier can exempt himself from liability for damages to cargo under the Harter Act, as a condition of exemption, he must establish affirmatively that he exercised due diligence to make the vessel in all respects seaworthy. International Navigation Company v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830; The Southwark (Martin v. The Southwark), 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65. The burden of affirmatively establishing the seaworthiness of the vessel, or that due diligence had been exercised to make her so, is exclusively the burden of the vessel owner. If he fails to carry it, or if the efficiency of the vessel is at all left in doubt, then that doubt must be resolved against the vessel owner and in favor of the cargo owner. The Wildcroft (W. J. McCahan Sugar Refining Co. v. The Wildcroft), 201 U.S. 378, 26 S.Ct. 467, 50 L.Ed. 794; The Southwark, supra. The establishment of the fitness to carry the cargo, or due diligence to make the ship so fit, is never left to presumption, it is a condition precedent before any exemption can be claimed. Kaufer Co. v. Luckenbach, D.C., 284 F. 160; The Wildcroft, supra.

The cargo libelants charge that the vessel was unseaworthy for a long time prior to the commencement of the present voyage with respect to her boilers and condenser and that due diligence was not exercised by the vessel owners to make her seaworthy; and that she was unseaworthy because she was not equipped with proper charts to enable her navigators to properly navigate the vessel in the Sundsvall district.

The shipowner contends that the distortion of the furnaces in the port and starboard boilers, occurring some days after the ship sailed from Kiel, was due to conditions which supervened at Kiel or after sailing therefrom, and that, in any event, due diligence was exercised to make the boilers seaworthy.

When the steamer Heddernheim was built in 1921, she was turbine propelled and was equipped with and designed for the use of three boilers. She fueled with coal. On June 16, 1927, she was acquired by Unterweser Reederei Aktiengesellschaft, her present owners. She was operated with turbines for a short time, and later that year her new owners took the turbines out,

and installed a Lenz engine with a waste steam turbine. She continued to fuel with coal until 1931, when she was converted to an oil burner. Whereas three boilers had been used before, but two boilers were used after her conversion.

Although it was forty-five days after the Heddernheim had sailed from Wifstavarf with a full cargo when her boilers were found to be useless, nevertheless there was no direct evidence produced which explained the collapse, no intervening circumstances were shown, nor any peril of the sea claimed to have been encountered, nor any claim that the collapse was caused by any damage due to the stranding off Draghallen, or to the drydocking at Kiel.

The entry in the ship's log on February 20, 1933, indicates the seriousness of the break-down: "In the course of the afternoon it was found that both furnaces of the starboard boiler were dented or buckled respectively. As a safety measure also the port boiler was inspected as well as that was possible, and an additional leak was found, and it appeared that also here the furnaces were dented. Since the starboard boiler can no longer be used for operation in the further course of the voyage, and since it was apparent that the leaking port boiler would also fail in the near future so that only the remaining center boiler would no longer assure the safety and manœuverability of the vessel it was decided in the officer's counsel after a detailed discussion that the engineer would put the vessel into an emergency port so as to guard the ship and cargo against major damage which would endanger it in the course of the voyage during the winter across the North Atlantic. As a result we set course on the port of Leith as an emergency port."

Many theories were advanced for the collapse of the furnaces, but upon inspection none of them stand as certain. The shipowners, through Henry Claudius, engineer superintendent of the Unterweser Reederei, claim that the furnaces became distorted due to overheating and that the overheating resulted from unequal firing, which, in turn, was caused by dirty oil. This theory, however, cannot be accepted as conclusive for there "was no signs whatever of oil to be found" when the boilers were examined by Germanischer Lloyd's at Leith.

A marine engineer, testifying for the shipowner, and a man of many years' experience, stated on the trial that he could not say, in his opinion, that the collapse of the furnaces was due in any way to improper firing or improper combustion of the oil. He further testified that he had never heard of a case where it was caused by unequal firing due to clogging of the burner with dirty oil. He also stated that he had no opinion as to what caused the collapse.

The shipowner also advanced a "cold blast of air" theory, in that the firemen, when changing nozzles, might have forgotten to shut off the flow of air and thus cause the air to go through the furnace into the combustion chamber and up against the tubes causing a sudden reduction in temperature. The fault with this theory is that it would require four carelessnesses of the same man or four different men on four different furnaces at about the same time. There is no evidence of this remote possibility, so that I am unable to accept it as even probable.

Heinrich Fritzel, Chief Engineer of the Heddernheim for eight years, stated about the collapse: "I maintain the same viewpoint as heretofore namely, that I don't know the probable cause of these collapses. I have heard and understand that there are various explanations for this collapse, but I believe one is as good as another and they are all just theory."

The cargo owners on the other hand, produced a consulting engineer and marine surveyor of many years' experience as an expert witness, who testified that in his opinion the cause of the collapse was that the boilers were being ruined by the faulty and leaky condenser which had not been rectified. His opinion was that, since a leaky condenser causes salt water to get into the boilers and the salt deposits scale around the necks of the tubes, that the blowing out of these tubes so that they could not hold water in the boilers, was the cause of the collapse. The shipowner refuted this theory of scale deposits causing the trouble, pointing out that when the boilers were inspected at Leith, there was little scale found on the walls of the boilers. However, evidence was produced which showed that the Heddernheim was using much more than the average amount of algor (a compound to remove the scale), which might indicate that this compound removed all the excess scale which would remain in the boilers after they were shut down. The shipowner points out that the boilers had been cleaned out at Bremerhaven just before the ship proceeded to her Swedish loading ports,

and that the starboard boiler had been in use only eight days under steam at sea. This theory of the cargo owners, although not conclusive, is plausible.

This expert witness for the cargo owners further testified that the Heddernheim was forcing her boilers by using only two instead of the three boilers with which she was equipped. He stated, in speaking of the structure of the furnaces: "The importance of that is, to give you a demonstration of what goes on, if you took a piece of flat steel in your hand and bent it back and forth like this (illustrating) it would eventually snap, it will give out, and that is what is happening here, having a violent shaking and concerted motion of those furnaces which is aggravated by this increased power so that they just won't stand it, in addition to which, of course, you, in causing that condition, are passing through those furnaces considerably more heat than they are there to take care of and you also are developing steam in a steam space which was never designed to develop that amount of steam, and every engineer knows very well that one of the serious causes of trouble in boilers is where the steam space is too small. In this case we are only providing two-thirds of the steam space that was originally available. If you put that additional heat in, overheat your furnaces, you soften the metal and the pressure on the inside forces them down out of shape."

He further stated that if there was no oil and no scale, and there was no soot in the tubes when inspected at Leith, then the only thing to cause the collapse, in his opinion, was the forcing of the boilers, causing the overheating and the collapse. And since there was no latent defects found in the furnaces by Mr. Claudius, upon inspection in Leith after the collapse, this theory advanced by this witness is very probable.

I was rather impressed with this expert witness for the cargo libelants. He was experienced and seemed to know what he was talking about. He had examined all the log books of the vessel, and practically all the exhibits relating to this branch of the case. He testified that the log books showed that on the previous voyage there had been a continuous fighting of the boilers and condensers; that prior to this voyage, when the vessel was at Bremenhaven, every tube should have been taken out of the condenser, tested and renewed; that prior to the present voyage there had been a partial collapse of the boilers and that there had been data of collapse of the boilers as far back as December, 1930; that in his opinion as far back as November 26, 1931, the starboard boiler needed attention. He further stated that in his opinion the vessel was not in a fit condition to undertake the voyage, because of the fact that the boilers were being ruined and placed in an unsafe condition, due to conditions which had not been rectified; and that which might be expected to happen on the voyage would be the collapse of the boilers or the blowing out of the tubes so that they could not hold water in the boilers.

It was stated in Martin v. The Southwark, supra, 191 U.S. 1, 13, 14, 24 S.Ct. 1, 5, 48 L.Ed. 65, that "* * * the right of the carrier to be exonerated in the respects named in the Harter Act depends upon the exercise of due diligence upon his part in discharging the primary duty of providing a seaworthy vessel. The burden of proof being upon the carrier to show that he has exercised due diligence to provide a seaworthy vessel at the time he received the meat [cargo] and started upon the voyage, the question arises, Was this duty discharged? * * * This sudden breakdown when the vessel was scarcely out of port would raise the presumption of unseaworthiness at the time of the sailing, making it incumbent upon the vessel owner to prove seaworthiness, and this independently of the provisions of the Harter Act. Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012." See, also, Benner Line v. Pendleton, D.C., 210 F. 67; Compagnie Maritime Francaise v. Meyer, 9 Cir., 248 F. 881, 885, and cases cited therein; Carolina Portland Cement Co. v. Anderson, 5 Cir., 186 F. 145; The Fort Caines, D.C., 24 F.2d 849, 1928 A.M.C. 569.

Although the presumptions that existed in the above cases were of relatively short duration, nevertheless I think the presumption that the Heddernheim was unseaworthy as to her boilers exists in the instant case even though the ship was forty-five days from her sailing, since it was admitted that the starboard boiler, which was in the worse condition, was used for only eight days.

The question now presents itself, what has the shipowner shown to rebut this presumption? To rebut the presumption, or to come within the exemptions in the Harter Act, it must show that it exercised due diligence in respect to making the boilers seaworthy.

It was a known fact, which was brought to the attention of the owners of the Heddernheim, that the vessel had trouble of one sort or another with her condenser tubes and boilers previous to the within voyage. In 1927 or 1928 the entire condenser was overhauled, and from October, 1932, to February 13, 1933, the Heddernheim stopped many times at sea or in various harbors to plug condenser tubes, and many tubes had to be replaced, in different ports, instead of being stopped with wooden plugs. The condenser tubes were known to be in a bad condition, for on the trial the chief engineer was asked: "Do you sometimes stop the vessel at sea on account of condenser trouble?" He replied: "Yes. That happens frequently."

Even though one of the shipowner's expert witnesses did testify that in his opinion this did not make the ship unseaworthy, nevertheless, after weighing all the facts presented, I am of the opinion that the shipowners have failed to show due diligence as to these tubes.

It should be noted, that on March 11, 1930, the starboard boiler was issued a certificate, which stated: "Boiler Walls: Furnaces show the beginnings of slight corrosion and the combustion chambers and combustion chamber back sheets are slightly dented. The furnaces are flattened and the starboard furnace should be constantly checked. Sundry stay bolts should be renewed."

On July 2, 1931, another certificate was issued in respect to this boiler, which read: "Boiler Walls: No major changes in the material and the untrue parts of the furnaces except the tube walls of the combustion chamber which are somewhat 'wavy'. Some edge cracks in the combustion chamber. Seams should be veed-out and welded electrically."

The port boiler, the furnaces of which also had to be replaced at Leith, was issued certificates at the same time, and as of March 11, 1930, it stated: "Boiler Walls: Slight traces of beginning corrosion on furnaces and combustion chambers. The back walls of the combustion chambers are slightly dented and the furnaces are slightly flattened. Sundry stay bolts should be replaced and the weldings in the corners should be gone over * * *".

And, again, on July 7, 1931, the certificate stated: "Boiler Walls: The material and the out-of-round parts of the furnaces show no particular change except that the combustion chamber walls have become somewhat 'wavy'. Some edge cracks in the combustion chambers should be veed-out and electrically welded."

The shipowner points out that on July 30, 1931, the port boiler was issued another certificate in which it was acknowledged that the stay bolts and boiler tubes were replaced in accordance with the recommendations, and that the boiler passed a hydrostatic test of 18 atmospheres. There was also evidence produced by the shipowner that repairs were made to the starboard boiler, and that a certificate was issued on July 30, 1931, which recites that such repairs were made.

However, taking into consideration all of the above facts which were known to the owners of the Heddernheim, that the condenser tubes were faulty, and that the furnaces were distorted, I must hold that the vessel was unseaworthy as to her boilers, and that the owners did not exercise due diligence to make the ship seaworthy. The shipowner has no adequate explanation for the breakdown of the boilers, and the theories advanced by the owner are either refuted by the facts adduced, or by their own witnesses who testified that all the explanations offered were just theories—"one as good as the other."

The mere fact that the usual inspection was made of the boilers and condensers before sailing from the original port and from the Swedish port of Wifstavarf is not due diligence when it was known to the owners that the condenser tubes were constantly breaking down prior thereto, and that the boilers themselves were not in a seaworthy condition.

The question of the collapse of the boilers is a most troublesome one. The testimony was highly technical, but from it all, I am convinced that the shipowner had notice for a long time that more than the ordinary inspection and care was required.

The different inspections made of the boilers after their collapse, in Leith, leaves the actual cause of the collapse to conjecture, as none offer any tangible facts which might definitely establish the cause. Thus, I cannot find from the evidence with certainty just what caused the boilers to collapse so suddenly, but I am of the opinion that the condition of the boilers and the tubes of the condenser had existed for a long time and that had proper care been

taken of them and due diligence used, the collapse would not have occurred.

Since the vessel was unseaworthy, and the shipowners did not use due diligence in making the ship seaworthy before sailing from her original port, the shipowner loses its right to exemption under the Harter Act for damages or loss resulting from faults or errors in navigation or in the management of the vessel.

The question has been raised whether the striking of the rock off Draghallen lighthouse was a fault or error in navigation, or a peril of the sea. I have come to the conclusion that the stranding was such a fault or error in navigation.

The steamer Heddernheim left Wifstavarf in the Sundsvall district for the first time at 8:45 P. M. on January 4, 1933. She had a draft of 25 feet 11 inches forward, and 25 feet 2 inches aft. There was a southerly wind with a velocity of only 2 or 3 knots with clear weather and good visibility. There was a government licensed pilot on board by the name of Rydborg. The captain was on the bridge along with the pilot, as well as the third mate and a helmsman. At 9:48 P. M. the vessel steered into the fixed white sector of Draghallen light. The course of the Heddernheim was changed to port when the light of Svartvik disappeared behind Hamburg's Udde, and Draghallen was sighted on the starboard bow. Before passing Draghallen, the light turned red. At 10:03 P. M. the vessel passed Draghallen light to starboard, the vessel full steam ahead. When Draghallen was passed abeam at an estimated distance of 150 to 200 meters, the vessel struck a rock and passed over it.

The pilot Rydborg testified that the ship struck a "before unknown shoal consisting of a large rock." According to the report made to the Royal Pilot Commission of Sweden the stranding took place from 130 to 150 meters off the lighthouse.

The cargo libelants produced, at the trial, the English Baltic Pilot and the Swedish Sailing directions, which instructed that a vessel must pass the Draghallen lighthouse about 370 to 400 meters to the north or south. This would indicate that the ship was navigating too close to the lighthouse, was not in the course of safety, and hence was negligent in passing so close to the lighthouse, particularly when it was known that many rocks were in this neighborhood.

Nor can the blame be passed to the pilot. Unterweser Reederei Aktiengesellschaft, the owner of the Heddernheim, issued directions or instructions to its ships' officers which reads as follows:

"Pilots—We take pains to point out that also during the presence of a pilot on the bridge, the master or the officer on watch, respectively, is at all times in command of the vessel and carries the responsibility for the same.

"The master and the officers are held to familiarize themselves with all rules and regulations in force with respect to the routes in question.

"They are required to check the instructions of the pilot continuously on basis of the sea charts, special charts, and sailing manuals."

The duty of the captain of the vessel is thus well established to keep a check on the pilot, and the fact that the vessel went aground when it was passing a known dangerous reef would indicate that the captain was negligent in his navigation, and failed in his duty to check the pilot's course and navigation.

Nor can the shipowner refute the fact that the Heddernheim was too close to the reef by alleging that another vessel may have been passing in the opposite direction; or that there was an obstruction in the center of the channel, as there is no factual basis for either assumption, which consequently must be ignored by the court.

I have come to the conclusion, as stated above, that the Heddernheim was unseaworthy as to her boilers for a time prior to her sailing from her original port; that the shipowner has failed to exercise due diligence to make the vessel seaworthy in respect to her boilers; and that the cause of the stranding was due to negligent navigation.

The cargo libelants have asked this court to find as an additional fact that the Heddernheim was unseaworthy in not having a Swedish chart on board for navigating in the Sundsvall district. The vessel did have a chart for navigating in this district, but it was a German chart of the scale of 1-200,000, instead of the Swedish chart of the scale of 1-100,000.

It should be noted that there were only two available charts of the vicinity of Draghallen lighthouse: the Swedish chart (Exhibit 10), and the German chart (Exhibit 9). This latter chart was on board the

vessel and available for use. As a matter of fact at the time of the grounding the vessel was being navigated by a government pilot and the captain without a chart.

An examination of the charts show no great difference between them. The German chart appears to be as serviceable as the Swedish chart. The difference in scale is not of such great consequence, when on both the important objects can be ascertained without difficulty. As a matter of fact neither chart may be classed as of "large scale". The German chart for a German captain, officers and crew would seem more suitable and serviceable than a Swedish chart, even though the latter might have on it more details.

I am satisfied from an examination of the two charts and from the evidence, that the German chart gave notice to the captain of the general situation around Draghallen, and the dangers there to be encountered. It showed practically all the navigational aids that are supplied on the Swedish chart. It showed among other things the reefs around Draghallen.

There were experts on the use of charts in this particular part of the world produced by each side, and after weighing their testimony, I am of the opinion that the weight of that testimony confirms my finding on this point.

If the captain had been familiar with the German chart he would have been warned of the dangers around Draghallen; the various landmarks; light sectors and other material things necessary for him to know when navigating in this vicinity. There was nothing lacking in the German chart which would affect the navigation of the ship.

I therefore hold that the Heddernheim was not unseaworthy on sailing from Wistavarf because the master did not have on board the Swedish chart instead of, or in addition to, the German chart.

The cargo owners have also raised the point that the Heddernheim was unseaworthy on sailing from Sundsvall, and that due diligence was not used to make the ship seaworthy before sailing therefrom.

 After striking the rock off Draghallen light, the Heddernheim was brought back to the port of Sundsvall, the principal port of the district and beached on a clay bank. It was found that her No. 1 hold was filling with water, and upon examination by three surveyors appointed by the Sundsvall Magistrate's Court, it was reported that the damage which had effect upon the seaworthiness of the vessel, was to be found ahead of the bulkhead between hold No. 1 and hold No. 2. The owner sent its Marine Superintendent to assist in repairing the vessel, and after consultation, the vessel was removed from the clay bank, her cargo was unloaded, temporary repairs were effected, as recommended by the surveyors, after checking a diver's report. There can be little doubt but that the ship was unseaworthy when she left the port of Sundsvall, despite the fact that the surveyors at Sundsvall issued a certificate of seaworthiness.

The captain of the vessel testified as follows:

"Q. Well, that means that a ship that cannot meet that kind of weather without springing these leaks is unseaworthy, don't you think? A. Well, I thought myself she was not seaworthy when I turned back.

"Q. That means when you started to go to Kiel? A. Yes, yes.

"Q. Well, you still are of that same opinion, I think, aren't you, that you were right * * *? A. Oh, sure."

The shipowner contends that the Heddernheim, after sailing from Sundsvall, met rough weather off the southern extremity of Sweden, and that this caused the ship to spring a leak in No. 2 hold, which necessitated putting into Kiel for repairs. However, the captain testified that the weather was ordinary weather, and that it was not heavy or rough.

 However, I am satisfied that the owners and the captain exercised due diligence to make the ship seaworthy on sailing from Sundsvall. Although the captain admitted that the ship was unseaworthy when he turned back to Kiel, he did believe that the ship was seaworthy when he sailed from Sundsvall. There was no drydock in the vicinity of Sundsvall, in which the ship could be thoroughly inspected, so that the surveyors and the owner had to rely upon the diver's report of the condition of the ship's bottom, and upon their own physical inspection inside the holds. From these inspections the surveyors ascertained the condition as they thought it existed, and recommended the necessary repairs. These repairs were made by the owner, and a certificate of seaworthiness was issued by the three surveyors who were apparently competent and disinterested. The captain, with the assistance of the owner's representative,

did everything he could have done under the circumstances, and I am convinced that he exercised proper judgment, and due diligence, in making the ship as seaworthy as possible before sailing from Sundsvall. If any error was committed, it was, at most, an error of judgment. See The Guadeloupe, D.C., 92 F. 670.

The shipowner admits that the damage to the cargo from fuel oil, and the soiling and chafing of the wrappers from discharging and reloading at Sundsvall and at Kiel, are directly attributable to the casualty at Draghallen, as well as the seawater damage to the bales in No. 1 hold which were discharged and sold at Sundsvall. Since I have found that the vessel was not in all respects seaworthy on sailing from Wifstavarf; that the owner did not use due diligence to make her in all respects seaworthy; and that the cause of the stranding was due to negligent navigation, the shipowner is not entitled to an exemption under the Harter Act, and is liable for the damage to the cargo herein.

It has been held that there need be no causal relation between the defect or unseaworthiness and the ensuing loss. May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft (The Isis), 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; The Elkton, 2 Cir., 49 F.2d 700; The Willdomino, 3 Cir., 300 F. 5. Therefore, the cargo owners are entitled to a decree for the damage to their cargo which was on board the Heddernheim, and the shipowner is not entitled to exoneration under Section 3 of the Harter Act, or to exoneration due to paragraph 2 of the within bills of lading.

The shipowner has filed cross-libels herein for general average in putting into Sundsvall, into Kiel, and into Leith, under a clause in the bills of lading which incorporate Rule X of the York-Antwerp rules of 1924. However, since this court has already found that the Heddernheim was unseaworthy in respect to her boilers; that the stranding was due to negligent navigation; and that, in any event, the shipowner did not exercise due diligence in making the vessel in all respects seaworthy, I must hold that the cargo owners, and the guarantors of the general average, are not liable for general average. The Isis, supra.

The cargo owners are therefore entitled to a decree dismissing the libels of the shipowner for general average, and to a judgment for the damage to the cargo herein.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith. I would suggest, that if findings of fact and conclusions of law are submitted for my signature, that they be on five days' notice of settlement. The opposing counsels, if they be so disposed, should submit, on two days' notice, criticisms of the proposed findings, as counter-findings will avail them nothing.